JENKINS and others, Executors, Respondents, vs. BRADLEY and others, imp., Appellants.

*May 20 — November 24, 1899.*

*Corporations: Equity: Parties: Action by stockholders: Issue of stock in exchange for land: Failure of title: Liability: Indemnity agreement between promoters: Fraud: Limitation of actions: Judgment.*

1. In an equitable action by stockholders of a corporation, suing as such on behalf of themselves and others similarly situated, on the ground that the governing body of the corporation refuses to proceed, only a cause of action in favor of the corporation itself, not one belonging to individual members, can be enforced.
2. Tenants in common of lands quitclaimed them at an agreed valuation to a corporation organized by themselves, in exchange for full-paid stock. As to an undivided one-fourth interest in said lands certain of the grantors had the legal title, but merely as security for a debt. This fact was known to all, but all supposed that the debtor's interest therein had been forfeited or was of very little value, and stock purporting to be full paid was therefore issued for said one-fourth interest the same as for the other interests. It is claimed that at and prior to the organization of the corpora-

tion the grantors of said one-fourth interest agreed with another grantor, J., that they would indemnify and hold him harmless from any defect in the title to said one-fourth, and that said agreement was the consideration moving to J. for the conveyance to the corporation of his interest in the lands. *Held*, that such agreement, if made, was a personal agreement and did not inure to the benefit of, and could not be enforced by, the corporation.

3. After the organization of the corporation the debtor above mentioned established his right to redeem said one-fourth interest in the lands. Thereupon the corporation purchased his interest at a fair price, paying therefor out of the corporate funds. All the directors voted for such purchase, but it is claimed that the representatives of J.'s estate so voted upon the assurance of the other directors that said estate should not be in any manner prejudiced thereby. *Held*, that such purchase, and the refusal of the grantors of said one-fourth interest to reimburse the company or J.'s estate on account of the failure of the title thereto, did not constitute a fraud upon the corporation.

4. At the time said one-fourth interest was quitclaimed to the corporation the interest of the grantors therein was worth about $15.000, but all parties supposed it was worth the face value of the stock issued for it, which was $55,000. *Held*, that the title to the stock so issued did not fail entirely.

5. Failure of title to said one-fourth interest did not give the grantors thereof the right to return the stock issued therefor to the company and, upon accounting for the benefits received on account of such holdings, to be relieved from further obligation.

6. Having no election as to the holding of the stock issued for said one-fourth interest, the retention of such stock by the grantors of that interest and payment for the said debtor's interest therein out of corporate funds imposed no obligation upon said grantors beyond the obligation which arose from the failure of their title.

7. Although the purchaser of real property, in the absence of proper covenants, generally takes it at his own risk and has no remedy in case of failure of title, yet, if the grantors occupy a fiduciary relation to the grantee and the parties have acted in ignorance of, or under mistake as to, their antecedent legal rights, a court of equity may look into the transaction and grant relief.

8. The grantors of said one-fourth interest were promoters and directors of the corporation. All the parties supposed that, under a power of sale in the agreement with the debtor, said grantors could and did convey his interest to the corporation. In his action to redeem, said grantors set out that they had made such conveyance

and had in their hands about $40,000 (being the difference between the amount due from him and the valuation at which said one-fourth interest had been taken by the corporation) to which he was equitably entitled. After it had been determined that they had conveyed only a mortgage interest to the corporation, they virtually admitted that they were liable to the corporation for said difference between the value of the mortgage interest and the amount of the stock issued therefor, and denied only that they were liable for the full amount paid by the corporation for the debtor's interest; and there was an understanding among the directors that the company was to be reimbursed on one basis or the other. *Held,* that said grantors were both legally and equitably bound to make good their stock on the basis of the difference between what they paid and what they received.

9. Even if the cause of action in favor of the corporation arose against said grantors when the deed was made, yet the conduct of the grantors, and their subsequent recognition of liability, in connection with all the surrounding facts and circumstances, is *held* sufficient to show an agreement on their part to pay, and to take the case out of the statute of limitations.

10. Though such liability of said grantors was to the corporation and was made to appear in an action brought by certain stockholders on behalf of the corporation, yet, all the parties interested being before the court, and it appearing that there had been individual settlements between said grantors and one stockholder and between certain of the grantors and the plaintiffs, so that it would be unjust to require the remaining grantors, who had not settled with plaintiffs, to pay to the corporation money for general distribution to the stockholders, a judgment against said grantors who had not settled and in favor of plaintiffs directly, for their share of the amount equitably due, is *held* proper, in order to prevent circumlocution and injustice.

APPEAL from a judgment of the circuit court for Milwaukee county: D. H. JOHNSON, Circuit Judge. *Reversed.*

Prior to 1871 one James Jenkins was the holder of the legal title to a tract of about 17,000 acres of timber lands. He held in his own right a three-fourths interest, and the legal title of the remainder as a security for the payment of a loan of $10,000 to Elijah Swift, who was the real owner thereof. On October 14, 1871, Jenkins conveyed to Daniel

Bradley and *A. P. Lovejoy* a three-fourths interest in said
lands, and took back an agreement, reciting the interest of
Swift, in which they agreed to convey to Swift a one-third
interest in the title they received upon compliance by him
with all the conditions of said agreement with Jenkins.
Under the sale from Jenkins, Bradley took twelve-twentieths
and *Lovejoy* three-twentieths of the entire tract. On July
13, 1872, Bradley conveyed to Asa P. and David Kelly an
undivided one-third of his twelve-twentieths interest in said
land, and also one half of his interest in the undivided quar-
ter interest mentioned as belonging to Swift. On September
15, 1875, Bradley quitclaimed his remaining interest in
said lands to his son *Edward Bradley*, in trust, in equal
shares for his three sons, *Edward*, William H., and James
Bradley. The title then stood as follows:

| | |
|---|---|
| Jenkins | 5-20 |
| Lovejoy | 3-20 |
| A. P. Kelly | 3-20 |
| D. Kelly | 3-20 |
| E. Bradley | 2-20 |
| W. H. Bradley | 2-20 |
| James Bradley | 2-20 |
| | 20-20 |

The title to the Swift interest was held as follows:

| | |
|---|---|
| Lovejoy | 3-60 |
| D. Kelly | 3-60 |
| A. P. Kelly | 3-60 |
| E. Bradley | 2-60 |
| W. H. Bradley | 2-60 |
| James Bradley | 2-60 |
| | 15-60 |

Thereafter the holders of this title formed a copartnership
as Bradley Bros. & Co.; and jointly conducted logging opera-
tions on said lands. Some time prior to and during the year
1882, the parties entered into negotiations among themselves
for the formation of a corporation to take said lands and
other lands owned by them and conduct the logging and

lumbering business. These negotiations finally culminated in the organization of a corporation called the State Lumber Company in October, 1882. The capital stock was $500,000, with 5,000 shares of $100 each. At that time the Swift interest had not been redeemed, and neither interest nor taxes had been paid by him. The matter was talked over among the parties, and the conclusion was reached that Swift had abandoned and forfeited his interest in the land, or it was of very little value; so it was agreed that each one should convey his interest to the corporation by quitclaim deed, and receive therefor a proportionate share of its capital stock. The parties owned other lands, which were also conveyed to the corporation. The value of the so-called "Jenkins lands"— being the tract first mentioned — was agreed upon as being $222,527.55, and stock purporting to be fully paid was issued therefor, Jenkins getting five twentieths, and the other parties in proportion to their interests as above stated. The stock amounting to $55,631.89, representing the Swift interest, was issued to *Lovejoy*, the Bradleys, and the Kellys in the proportions stated. The parties named and one Benjamin Sweet constituted all the subscribers to the capital stock. The corporation was duly organized, the parties named being the directors, and proceeded to carry on a general logging and lumbering business. Jenkins died March 22, 1885, leaving a will, in which the plaintiffs in this action were named executors and executrix.

On May 5, 1886, Swift commenced an action against the State Lumber Company, *Lovejoy*, and *Edward Bradley* to redeem his interest in said lands, and for an accounting as to timber cut, and to secure a reconveyance; and in the course of this litigation this court determined that he was entitled to the relief sought. 71 Wis. 476 (April 17, 1888). After this suit was decided, the Bradleys, Kellys, and *Lovejoy* entered into negotiations with Swift for a settlement. The result of such negotiations was reported to a meeting

of the board of directors of the State Lumber Company, held June 20, 1889. At that meeting all of the directors were present except *Edward Bradley, J. H. Jenkins* representing the Jenkins interest. After a consideration of the matter, a resolution was adopted authorizing a purchase of the Swift interest by the company for $172,000, all the directors present voting therefor. The settlement was finally made, and Swift's interest was conveyed to the company. In February, 1892, the company paid Swift the further sum of $25,257.32 for timber cut on the Jenkins lands prior to that date, and also paid $6,956.13 as expenses of the litigation.

Some time in November, 1891, the plaintiffs and Sweet served a notice upon the officers of that company, calling attention to the fact that the funds of the company had been used in the purchase of the Swift claim and for expenses of the litigation, and claiming that the money so used was a charge against the parties who received the stock issued by the company in consideration for the alleged transfer of the lands upon which Swift had a claim. They also claimed that there was a failure of consideration for which this stock was issued, and that the holders of it ought to make good to the company the amount so expended. They demanded, among other things, that the officers of the company should institute proceedings to cancel such stock and recover all dividends paid thereon, or, if they were entitled to hold the stock, then to compel the holders to make good to the company the amounts so paid out in satisfaction of the Swift claim. The company neglected to take any action in the premises, whereupon this suit was instituted, the plaintiffs suing, in their capacity as stockholders, to enforce the rights of the company for the protection of their rights.

The complaint set out the facts substantially as before stated, and alleged, in substance, that at the time the corporation was formed it was expressly agreed between James Jenkins and the Bradleys, Kellys, and *Lovejoy* that, in con-

sideration of the issue to the latter of full-paid stock for the
Swift interest, they would pay and discharge all claims Swift
might have, and save the corporation and the said Jenkins
and the stock issued to him harmless therefrom, and would
indemnify the corporation and said Jenkins and the subse-
quent owners of the stock issued to him against any failure
of title as to said Swift interest; that pursuant to this agree-
ment the corporation was organized and each of said parties
conveyed to it their interests in said lands by quitclaim deeds,
Jenkins assuming to convey a one-fourth interest, and the
other parties a three-fourths interest therein; that Jenkins
parted with his interest upon the express understanding that
the other parties should guarantee the title to the Swift
interest, and save him and the corporation harmless from
any loss or outlay on account of the same; that the stock so
issued for the Swift interest, being about 589 shares, was dis-
tributed among the Bradleys, Kellys, and *Lovejoy* in blocks
proportionate to their several holdings in the land; that
Jenkins died, leaving a will, in which he bequeathed one
fifth of his stock to his son *James*, and the remainder in trust
to his executors for the benefit of his daughters.    The com-
plaint then sets out the Swift suit, and the proceedings
therein, the settlement and purchase by the corporation of
the Swift interest, which is alleged to have been a misap-
propriation of the funds of the corporation and a wrong to
the stockholders; that no part has been repaid to the corpo-
ration, nor have they indemnified the plaintiffs, except that
W. H. and James Bradley have repaid to the plaintiffs and
Benjamin Sweet their several proportions of the money so
taken, and except that the Kellys have also settled with
Sweet, which settlements were made without prejudice to
this litigation.    The demand for relief was that the defend-
ants account for all dividends received on the stock, that an
account be taken of the moneys paid out by the corporation
on account of the Swift interest, and the amounts due from

the defendants to plaintiffs be ascertained, and that they be adjudged to pay said amount, etc.

The answer alleges, among other things, that at the time of the organization of the corporation, the exact status of the Swift interest was known to all the incorporators and subscribers to stock; that they all supposed that Swift's interest, he being greatly in default, was of little or no value, and it was agreed to disregard any claim Swift might have. It was expressly denied that there was any agreement to indemnify Jenkins against the same, or that they would pay or discharge the Swift claim. It was alleged that *J. H. Jenkins* was present at the meeting of the board of directors when it was decided to buy in the Swift interest, and voted to make such purchase. The answer also sets up the statute of limitations.

The action was entitled as an action against the State Lumber Company, the three Bradleys, the Kellys, *Lovejoy, J. H. Jenkins,* and Benjamin Sweet. Service was never had upon the defendant Asa P. Kelly, he having died after the summons was issued, and before service. After the summons was issued, and before the complaint was served, W. H. and James Bradley settled with the plaintiffs, as hereinbefore stated, and they seem to have dropped out of the litigation. During the pendency of the suit the defendants settled with Benjamin Sweet, and he also seems to have passed out of the case.

The action was tried before the court, and, after long delay, findings were filed of the following tenor, in addition to the facts above stated: That the total number of shares in the defendant company subscribed for and issued was 4,571, of which Jenkins had 860. That prior to the date of the incorporation of the State Lumber Company the Bradleys, Kellys, and *Lovejoy* agreed with Jenkins "to take care of and protect the title to the Swift one-fourth interest" so conveyed by them to the company, "and in all

respects to indemnify and hold said James Jenkins harmless from any defect in the title to said Swift one-fourth interest." That Sweet had no interest in the title to the so-called "Jenkins lands." That the negotiations for the purchase of the Swift interest were conducted by one A. J. Hayward at the instigation of the Bradleys, Kellys, and *Lovejoy*, and that a deed came through him to the company. That the amount paid by the company for the purchase of the Swift interest was $172,000; for timber cut, $25,257.32; and for costs and expenses of litigation, $6,956.13; and that the total amount paid out on account thereof for all purposes was $215,613.63. That the representatives of the Jenkins estate knew nothing of the negotiations as to the settlement with Swift until the resolution to settle the matter was presented at the meeting of the board of directors, and that *J. Howard Jenkins*, one of the executors, who was present, voted for said proposition upon the assurance of W. H. Bradley that the Jenkins estate would not be required to indorse any of the notes of the company given on said settlement, and that the same would be taken care of by the Bradleys, Kellys, and *Lovejoy*, and that the Jenkins estate would not be in any manner prejudiced thereby. That the Swift litigation was carried on by the Bradleys, Kellys, and *Lovejoy*, and neither the Jenkins estate nor Swift was ever called upon to contribute to the expenses of said litigation. That prior to 1892 it was never claimed by *Edward Bradley*, *Lovejoy*, or the Kellys that the Jenkins estate was in any, manner to be prejudiced by the Swift claim, and frequent assurances were given, at the meetings of the board of directors and the stockholders that whatever obligation arose therefrom should be upon the Bradleys, Kellys, and *Lovejoy*, and that these assurances were given by W. H. Bradley, the president and general manager of the company, in presence of the other members and stockholders. In the eighteenth finding it is stated, in substance, that at

the time of the commencement of the Swift suit the execu-
tors were informed by W. H. Bradley and other members of
the company that the Jenkins estate should be in no man-
ner prejudiced by said litigation, and that in the pleadings
in that action it was expressly admitted that the Bradleys,
Kellys, and *Lovejoy* had in their hands $40,004.29 as due and
owing from them as the unpaid balance under the Swift
contract.

It was further found that these parties claimed in said
litigation that they had attempted to convey said land to
the company under a power of sale in the agreement with
Swift, and that, if a good title was not conveyed thereby,
Swift was entitled, as against them, to the amount received
by them by reason of the attempted conveyance to the
company; that at the annual meeting of stockholders in
September, 1889, there had been paid out of the funds of
the company on the Swift claim $15,000; that the Jenkins
holding of stock was about one fifth; that W. H. Bradley
then expressed the opinion that a proportionate amount
should be paid to the Jenkins estate; that the other mem-
bers present expressed no opinion in relation thereto, but on
January 14, 1890, the sum of $3,000 was paid to the Jenkins
estate; that said matters of difference came up at the annual
meeting in September, 1890, and the principal question in
dispute was whether or not the Bradleys, Kellys, and *Love-
joy* should pay back to the company on the basis of the
value of the lands as originally turned over to the company;
that at that time an additional sum of $50,000 had been paid
on the Swift notes, and it was thereupon arranged that the
Jenkins estate should receive its proportionate share, and
accordingly $5,000 was paid in September, 1890, and $5,000
in March, 1891; that neither *Edward Bradley, David Kelly*,
nor *Lovejoy* has ever reimbursed the company on account of
the failure of title to the Swift interest; that, after the com-
mencement of this action, W. H. and James Bradley paid

the Jenkins estate $10,300 in settlement of any claim the State Lumber Company or the Jenkins estate might have against them by reason of the failure of title so far as the Jenkins estate is concerned; that the paying of said Swift claim out of the moneys of the corporation, and the refusal of said defendants to reimburse after due demand, was a fraud upon the corporation and upon said Jenkins estate.

As conclusions of law the court found: (1) That plaintiffs were entitled to the relief demanded in the complaint. (2) That at the time of the commencement of this action a cause of action had accrued to the plaintiffs as against *David Kelly*, *Lovejoy*, and *Edward Bradley*, and, the company having failed to prosecute, the plaintiffs were entitled to bring this suit. (3) That the right of action, so far as the Jenkins estate was concerned, was not barred by the statute of limitations. (4) That the defendant company did not have, and never had, a cause of action against the Bradleys, Kellys, and *Lovejoy* until they assumed a hostile position towards the minority stockholders, about 1892. (5) That it was a fraud as to the Jenkins estate to pay the Swift claim without indemnity to said estate. (6) That the Bradleys, Kellys, and *Lovejoy* never paid for their stock in said company; that the company never agreed to take their interest in the Swift interest "purely as a mortgage interest;" that by reason thereof their title to the stock issued to them for the Swift interest failed; that when they and the company elected and decided for themselves that the same had so failed they had a right to return the stock to the company and account for all benefits received; that they voluntarily elected to hold said stock and pay the Swift claim out of the property of the corporation; and that, having so elected, they are, as against the Jenkins estate, chargeable with their proportionate share.

Exceptions were duly filed to nearly all of the findings. A judgment was subsequently entered requiring the defend-

ants *Edward Bradley*, *David Kelly*, and *Allen P. Lovejoy*
to pay to the defendant State Lumber Company the sum of
$170,012.88, as follows: *Edward Bradley*, $42,507.72; *David
Kelly*, $63,752.58; *A. P. Lovejoy*, $63,752.58. The judgment
was to be docketed against the defendants as stated, and
execution was to be issued to collect the same. The said
defendants were also adjudged to pay plaintiffs' costs. From
this judgment the defendants have appealed.

For the appellants there was a brief by *Quarles, Spence &
Quarles*, and oral argument by *Charles Quarles*.

For the respondents there was a brief by *Winkler, Flan-
ders, Smith, Bottum & Vilas* and *Finch & Barber*, attor-
neys, and *James G. Flanders*, of counsel, and a separate brief
by *Barbers & Beglinger*, and oral argument by *Mr. Flan-
ders* and *Mr. Charles Barber*.

BARDEEN, J. The determination of this case has been
greatly delayed. If any explanation is necessary it may be
found in the fact of the inability of the members of the
court earlier to meet on any common ground. From the
outset, however, the court has been unanimous in the opin-
ion that the judgment of the court below could not stand.
The action is one by certain stockholders, suing on behalf
of themselves and others similarly situated, to enforce a
cause of action supposed to exist in favor of the defendant
State Lumber Company and against the defendants Brad-
leys, Kellys, and *Lovejoy*, which the corporation neglects or
refuses to prosecute. As stated in *Land, L. & L. Co. v. Mc-
Intyre*, 100 Wis. 245: "The purpose of the remedy in such
cases is not to interfere with the exercise of legal discretion
on the part of those charged with the primary duty of en-
forcing corporate rights, but to furnish relief where there
is an unjustifiable neglect or refusal to exercise such discre-
tion. Neither is the remedy confined to the one which the
corporation may invoke, whether legal or equitable. The

remedy afforded to the members of the corporation is neces-
sarily in equity, for he has no direct interest to be protected
by a personal action.   He must proceed in equity or not at
all, joining the corporation as a party in the capacity of
trustee for all its members.   .   .   .   The direct injury to
be remedied is to the corporation as a whole.   The cause of
action belongs to the corporation, but is enforceable, rather
than that justice shall utterly fail, by the remedy in equity
at the suit of its members."   It is therefore the cause of ac-
tion of the corporation, and not of its members, that may
be enforced in this kind of an action.   Any supposed agree-
ment or understanding between James Jenkins and the other
owners of the land, made prior to the organization of the
corporation, and as an inducement between the parties to
convey property thereto, is a personal agreement, and can-
not be enforced by the corporation.   While it may directly
affect the rights of the stockholder, such an agreement is
not one to which the corporation succeeds, and therefore it
has no right to enforce it.   It is upon such an agreement
that the findings and judgment in this action are based.

The only finding upon which any direct liability can be
predicated is the eighth, which is as follows: "That at and
prior to the date of the incorporation of said State Lumber
Company said *Allen P. Lovejoy,* William H. Bradley, James
W. Bradley, *Edward Bradley, David Kelly,* and Asa P.
Kelly agreed with said James Jenkins to take care of and
protect the title to said Swift one-fourth interest so con-
veyed by said *Allen P. Lovejoy,* William H. Bradley, James
W. Bradley, *Edward Bradley, David Kelly,* and Asa P.
Kelly, and in all respects to indemnify and hold said James
Jenkins harmless from any defect in the title to said Swift
one-fourth interest; and this agreement was the considera-
tion moving to said James Jenkins for his conveyance to
said State Lumber Company of his undivided one-fourth
interest in the said 'Jenkins lands,' so called."   The other

findings are of facts supposed to be confirmatory of this. agreement. There is very grave doubt whether any such agreement is shown by the evidence as against the defendants concerned in this litigation; but, suppose it is admitted that such an agreement was made, in what possible way is. the corporation interested in it? It was made prior to the incorporation of the company, made with an individual who represented no interest but his own, and was purely personal in its character. Under no conceivable theory are we able to perceive how such an agreement, if made, inured to the benefit of the corporation.

We have been greatly troubled to understand the exact. position of the court below in its conclusions of law. In conclusion No. 5, he finds that the State Lumber Company did not have, and never had, any cause of action against the defendants Bradleys, Kellys, and *Lovejoy* "until after they assumed a hostile position towards the minority stockholders, about 1892." We are not informed, nor are we able to discover either in the evidence or the findings, just what. conduct the defendants were guilty of in 1892, as against the minority stockholders, that created a cause of action in favor of the corporation. There was nothing that we can find that occurred that would enable the company to reach out and lay hold of the agreement said to have been made ten years previous to make it into a cause of action in its. favor. The matter is further confused by another finding, wherein it is said: "That at the time of the commencement of this action a cause of action has accrued to the plaintiffs. as against *David Kelly, Allen P. Lovejoy,* and *Edward Bradley;* and that, the State Lumber Company having failed to prosecute such action, the plaintiffs were entitled to bring this suit." Keeping in mind that it is only such rights as. the corporation itself could enforce that can be enforced herein, we have this singular condition of things. In the eighth finding, as noted, the court finds that the Jenkins

estate had a cause of action against the defendants. In the conclusion of law quoted it is said plaintiffs became entitled to prosecute this cause of action because the corporation has failed to prosecute it. In view of the legal principles governing this class of actions, such a conclusion cannot be justified. Any breach of the agreement found in the eighth finding would have given the Jenkins estate a cause of action on contract, and would have raised no right of action in favor of the corporation. When we come to consult the facts, the conclusion of the court was as clear a *non sequitur* as could be imagined.

We will now turn to another branch of the case. In the twenty-fourth finding the court said: "That the paying of said Swift claim out of money of the said corporation, and the refusal on the part of the said *Edward Bradley, David Kelly,* and *Allen P. Lovejoy* to reimburse after due demand made, was a fraud upon said corporation and upon said Jenkins estate." The fifth conclusion is that it was a fraud as to the Jenkins estate to pay said Swift claim without indemnifying said estate. There is no pretense, claim, or suggestion of any fraud, in the course of the whole proceedings, except such as arises from the fact that, after it was determined that Swift's interest was that of a mortgagor, the defendants, as directors, voted that the corporation should buy up his claim, which was done. All parties, including the plaintiff *J. Howard Jenkins,* knew the precise situation. There was nothing hidden or concealed. There was no star-chamber action by the board of directors; no attempt to overawe or intimidate the minority. All parties knew that the title to the Swift interest had failed. A proposition was submitted at a given price. As a business proposition, what was best to do? All agreed and all voted to purchase the Swift title. Independent of the personal relations of the stockholders in regard to this matter, it was certainly not fraudulent for the corporation to purchase something it did

not own.   It got value received for every dollar it expended
to buy this title.   No one claims it was not worth all that
was given for it.   When it was decided to make the purchase,
the resolution for which Mr. Jenkins voted provided that
the money should be paid out of the funds of the company,
$40,000 cash, and the remainder in several notes of the com-
pany, to become due in the future.   The court so finds, and
yet in a subsequent finding says that Jenkins voted for the
adoption of the resolution of purchase upon the assurance of
W. H. Bradley and of the other directors that such notes
would be taken care of by the defendants proportionately,
and that the Jenkins estate should not be prejudiced thereby.
Now, because such purchase was carried out according to
the very terms of the resolution, and these defendants have
refused to reimburse the Jenkins estate, the court finds that
it was a fraud both on the estate and the corporation.   On
that principle, every time a man breaches a contract he is
guilty of fraud.   The corporation did not suffer by the deal.
It had no title and got title.   It paid out its money and got
value received.   It was no worse off after the transaction
than before, as all the interested parties admit that the in-
terest purchased was fully worth the amount paid for it.
The fraud, if any, consisted in the fact that the defendants
did not keep their agreement with Jenkins.   We shall be
somewhat slow to extend the doctrine of fraud to the extent
sought in this proceeding.   It is not sanctioned either by
reason or precedent.   Whatever was done in this line of the
purchase of the Swift interest was directly within the terms
of the resolution for which Jenkins voted, to which he gave
his express consent.   That he was induced to do so by per-
sonal assurances of the members of the board of directors
gave the corporation no right of action.   The corporation
had a perfect right to buy in this outstanding title, and to
use its funds for that purpose, if such purchase was deemed
a good business venture.   The value of the stock held by the

Jenkins estate was in no way affected thereby, any more than it would be affected by any other business transaction of the kind. Whatever obligation the defendants sustained to the corporation arose when the title to the Swift interest failed, and not when it was decided to purchase it. The finding, therefore, that the purchase of the title and the failure of defendants to reimburse the Jenkins estate was a fraud which gave a right of action to the corporation, is wholly unwarranted and without foundation.

The criticisms upon the sixth conclusion of law are equally well justified. The first proposition is that defendants never paid for their stock. This is inconsistent with the eighth finding, before mentioned, and others, to the effect that the conveyance by defendants of the Swift quarter interest, together with the promise to Jenkins, was the consideration for the stock issued to them. It is inconsistent with the fourth conclusion of law, which holds that the corporation never had any cause of action until 1892. If the defendants subscribed and agreed to pay for certain shares of stock, and the attempted payment failed, a cause of action arose at once.

The second proposition is that the company never agreed to take the interest which the defendants had in the Swift quarter "purely as a mortgage interest." This interest had an admitted value of about $15,600, but all parties supposed that it was worth the face value of the stock issued for it. It was upon this basis that it was deeded to the corporation with full knowledge on the part of all concerned. While it may be true that the corporation did not agree to take it "purely as a mortgage interest," it is quite certain that the entire consideration for the stock did not fail. The company got only $15,600, when it supposed it was getting $55,000; and, knowing its precise status, it cannot be said that the *title* to the stock so issued failed entirely.

A further proposition in this finding is quite incompre-

hensible. It is to the effect that when the company and
the defendants elected and decided for themselves that the
title had so failed, "they had the right to return said stock
to the company and account for all benefits that they had
received for and on account of said holdings." As remarked
by the defendants' counsel, this would be a comfortable doc-
trine if correct, and would relieve many a promoter from
obligation on his stock subscriptions. No authority has been
suggested to support this proposition, and we doubt if any
could be found in the books.

The last proposition in this finding is that, having elected
to hold the stock and pay the claim of Swift out of corpo-
rate property, as against the Jenkins estate the defendants
were charged with a proportionate share. It is clear that
they had no election as to holding the stock; therefore no
obligation could arise against them in that regard. If there
was an election, then certainly they could only be charge-
able with the difference between what they agreed to give
for the stock — i. e. its face value — and the amount they
actually did give. The only election in the case was whether
the company should buy the property or go without it. Sup-
pose the company had adopted the latter alternative, no one
could rightfully claim that the defendants would be respon-
sible for the then value of the land. A promise to indemnify
Mr. Jenkins for any failure in this title never inured to the
benefit of the corporation so as to give it a right to enforce
Jenkins's claims against the promisors. Neither upon the
facts found nor the conclusions reached by the trial court
are we able to support the judgment rendered.

The judgment requires the three defendants now pro-
ceeded against to pay into the company's treasury the sum
of $170,012.88. This is on the theory that the corporation
should be made whole for all expenditures on account of
the failure of title to the Swift interest. This money, if paid,
would stand for the benefit of stockholders, and was re-

quired on the theory that it was the corporation's rights that were being enforced. But we find during the progress of the litigation that plaintiffs settled with two of the defendants upon payment to them of an amount supposed to represent the share that would go to the Jenkins estate upon the basis of the recovery against the other defendants. We are not quite able to reconcile this proceeding. It looks like throwing a much greater obligation upon the men who did not settle than equity will permit. If the plaintiffs had a right to settle with W. H. and James Bradley, pending the suit, a cause of action in favor of the corporation, and accept the fruits of said settlement for themselves, all parties being before the court, it would have seemed more like exact justice to have required the defendants to pay such sum as would make the plaintiffs whole instead of the larger sum which would go to the credit of all shares alike.

It being determined that the judgment entered cannot stand, we turn now to the question of what judgment should be entered under the facts proven. It is upon this question that the court has been in travail. It is a question not free from difficulty. It is clear from what has been said that the alleged agreement between Capt. Jenkins and the defendants cannot be enforced in this action. It is also quite as certain that the officers and directors of the company have not been guilty of any fraud or breach of trust which prejudicially affects the corporate interests of the plaintiffs. In order to better understand the situation, it is well to review briefly the history of the transactions involved in this litigation. Capt. Jenkins was the owner of a three-fourths interest and the mortgagee of the other one-fourth of a tract of 17,000 acres of land, holding the legal title to the quarter interest as security for $10,000 due from Elijah Swift. Under proper conveyances a part of the title reached the defendants, as shown in the statement. A corporation was decided upon and organized. This tract,

with other lands, was conveyed to it, each grantor executing quitclaim deeds. The price was agreed upon, and full-paid stock issued to each grantor. All parties knew of the exact condition of the title to the Swift quarter. He was many years in default in payment of taxes and interest. It was then supposed that his interest was of little or no value, and it was upon that supposition that it was agreed to give quitclaim deeds to the company. According to the testimony of W. H. Bradley, Capt. Jenkins objected somewhat to the quitclaim deed on account of the Swift claim, but it was arranged that the Bradleys, Kellys, and *Lovejoy* were to take care of it. No more definite statement of this alleged agreement appears anywhere in the evidence. Bradley, it appears, understood this to mean that the parties named were to buy in this interest, if asserted, whatever it might cost. This has been denied by the other defendants, who have asserted that, if liable at all, it was only on the basis of the face value of the stock issued therefor; that the value so fixed was about the true value of the land, and that they never in any manner agreed to become responsible for the increased value, or for any profits the company might realize in after years by such increase in value. This was the mooted question at the various meetings of the directors and stockholders, and the result was always the same.

Thus, from the very beginning to the end of their discussions about the Swift claim, there was a dispute as to the *basis* on which defendants should settle it. The Jenkins estate and W. H. Bradley claimed they should buy it in and pay all the expenses. These defendants asserted that, if liable at all, it was upon the basis of making good to the company the difference between the par value of their stock and the amount the company received thereon. It is a fact of absolute certainty that the defendants supposed they were conveying a good title to the Swift interest under the power of sale in his agreement. This appears not only from the

testimony of Bradley, but is set out in distinct terms in the answer made by them in the Swift suit. In that suit they set out that they had made such conveyance, and had in their hands about $40,000, which Swift was equitably entitled to. It was an admission of a distinct liability for the difference between the price they received for the land and the amount due from Swift. The amount due from Swift was over $15,500. The amount received for the land in stock of the company was over $55,000. It being determined in the Swift litigation that only a mortgage interest was conveyed to the company, the $40,000 still in their hands became equitably due to it upon the stock it had issued.

The defendants were promoters and directors of the corporation, and occupied toward it a fiduciary relation. As against the other stockholders, they were under the highest moral obligations to make good to the company the difference between what they received and what they in fact paid. All parties had acted under a mistake. While it is probably true that the parties understood the legal scope of their transaction when the conveyances to the company were made, yet they were ignorant of or mistaken as to the antecedent legal rights of the stockholders who conveyed the Swift interest. It is in such cases, if the accompanying circumstances warrant, a court of equity may be appealed to for relief. 2 Pomeroy, Eq. Jur. § 849. This rule is referred to as an answer to the argument that the stock became fully paid by a conveyance of the Swift interest. If, as we shall see, the attendant circumstances are such as not to preclude the company from asking the defendants to make good the payment on their stock, the attempt to claim it as full-paid stock must fail. The rule is general that a purchaser of real property takes it at his own risk, and in absence of proper covenants has no remedy in case of failure of title. 6 Am. & Eng. Ency. of Law (2d ed.), 781; *Union P. R. Co. v. Barnes*, 64 Fed. Rep. 80. But when the grantors occupy a fiduciary

relation to the grantee, and the parties have acted in igno-
rance of, or under mistake as to, their antecedent legal rights,
a court of equity may look into the transaction and grant
relief.   Here the parties conveyed under a misapprehension
of their relative rights.  They supposed the power of sale in
the Swift contract gave them full right to convey.   This,
we believe, is such a mistake as. brings the case within the
authorities, and will prevent the defendants from claiming
their stock as full paid.   Beach, Mod. Eq. Jur. §§ 37, 38;
2 Pomeroy, Eq. Jur. § 849; *Blakeman v. Blakeman*, 39 Conn.
320.   No one pretends to say that, had the true value of the
Swift interest been known, it would have been accepted as
payment for the stock issued.   At no time during the con-
troversy has any one of the defendants made any such claim.
What is more significant is the fact that the defendants never
denied their liability to respond to the corporation on the
basis admitted in the Swift suit.  They joined in the indorse-
ment of the notes to Swift.   At the annual meeting in Sep-
tember, 1890, the Kellys advocated a settlement on the basis
of the price at which the land was deeded to the company.
They took advice from their attorney and were advised that
this was the measure of their liability.   They settled with
Sweet on a basis approximating this standard.  At the meet-
ings of the board of directors and stockholders from time to
time these matters were under discussion, the one side claim-
ing the redemption of the alleged promise to Capt. Jenkins,
the other virtually admitting liability on the lesser basis, but
denying the greater liability.   The Jenkins estate was de-
manding money and insisting upon a settlement.   At one
time the company, by the express consent of some and tacit
consent of the other directors, advanced $3,000 to the Jenk-
ins estate, and at later periods two other advances of $5,000
each were made.   When we come to read the testimony as
to what was said at these meetings, and to consider all the
circumstances and surroundings, the conclusion is irresistible

that these advances were made upon the understanding that the company was to be reimbursed by the defendants on one or the other of the bases stated. It was not until a short time before the commencement of this action that any different understanding was suggested. When *Edward Bradley* succeeded to the presidency of the corporation, he directed the deduction of these advances from dividends declared on the Jenkins stock, and, as we understand the facts, this was done.

Now, considering all these circumstances, there is but one conclusion that a court of equity can arrive at, and that is that the defendants are both legally and equitably bound to make good their stock on the basis of the difference between what they paid and what they received. While it may be true that the cause of action arose to the corporation as soon as the deed was made, yet the conduct of the defendants, and their subsequent recognition of their obligation, in connection with all the surrounding facts and circumstances, are deemed sufficient to show an agreement on their part to pay, and to take the case out of the statute of limitations. So cogent and persuasive are these circumstances that any other conclusion is impossible. As already noted, this action is one on behalf of the corporation, and under technical rules each defendant should be directed to pay into the treasury of the company such proportionate sum as his holding of stock issued for the Swift interest bears to the entire shortage. But it appears that the stockholder Sweet has been settled with, and has no claim in this regard. During the progress of this litigation the Jenkins estate has settled with W. H. and James Bradley, so that they are out of the case. It would be quite unjust to require these defendants to pay in a large sum of money for general distribution to the stockholders. Inasmuch as all interested parties are before the court, and to prevent circumlocution and injustice, the court below may enter a judgment in

favor of the plaintiffs, the money to go to them directly upon the basis now to be stated. The difference between the face of the stock issued for the Swift interest and the value of the interest conveyed is as follows:

Stock issued.................................................. $55,631 81
Value of Swift interest....................................... 15,627 60

Difference ............................................... $40,004 21

Upon this sum interest should be computed from October 4, 1882, to April 1, 1893, at seven per cent., and thence to date of judgment at six per cent. The defendants would be liable for this amount as follows: *A. P. Lovejoy*, three fifteenths; *David Kelly*, three fifteenths; and *Edward Bradley*, two fifteenths. The total stock of the company outstanding is 4,571 shares, of which the plaintiffs had 860. The Jenkins estate would therefore be entitled to $\frac{860}{4571}$ of the sum found due from each of the defendants. Should it appear, however, that the advances to the estate by the company have not been satisfied, the judgment may be varied so as to work out the true equities of the case. On the basis above suggested, the judgment for plaintiffs at this date would be approximately as follows:

Against A. P. Lovejoy.........  ............................... $3,212
Against David Kelly ........................................... 3,212
Against Edward Bradley ..............................  ........ 2,146

Total .....................  ......................... $8,570

*By the Court.*— The judgment of the circuit court is reversed, and the cause is remanded with directions to enter judgment for plaintiffs in accordance with this opinion.