**BACKUS–BROOKS CO. v. NORTHERN PAC. RY. CO. et al.**

Circuit Court of Appeals, Eighth Circuit.
June 15, 1927.

No. 7602.

**I. Corporations** ⊜═320(3)—Minority stockholder's cause of action for directors' failure faithfully to serve stockholders held equitable, and doctrine of laches applied to time of commencement of suit.

Cause of action of minority stockholder in railroad corporation, suing on behalf of corporation, based on proposition that directors were elected and dominated by defendant, another railroad, which controlled all corporation's stock, and that directors operated corporation for benefit of defendant, instead of for corporation's stockholders, *held* within exclusive jurisdiction of equity, stockholder's interest in corporation, and in conduct of its officers affecting its property, being equitable and not legal, and doctrine of laches, and not statute of limitations, applied to time of commencement of suit.

**2. Corporations** ⊜═209—Stockholder must sue on behalf of corporation within reasonable time after acquiring knowledge, or be barred by laches.

A stockholder, who undertakes to sue on behalf of the corporation, must act promptly after acquiring knowledge of the conditions of which he complains, and if he stands by with knowledge of the facts for an unreasonable time his right to maintain such a suit will be barred by laches.

**3. Corporations** ⊜═212—Minority stockholder, suing for corporation on wrongs occurring over 6 years before filing bill, had burden of showing application of doctrine of laches inequitable (Gen. St. Minn. 1923, § 9191).

Where wrongs asserted by minority stockholder of railroad as basis for stockholder's suit on behalf of corporation occurred more than 6 years prior to filing of bill, burden was on such stockholder to allege and prove facts which would make it inequitable to apply thereto the doctrine of laches by analogy to 6-year limitation of Gen. St. Minn. 1923, § 9191.

**4. Equity** ⊜═82—Institution of prior suit, not diligently prosecuted, does not itself excuse laches in bringing subsequent suit.

The mere institution of a prior suit without undue delay after the cause of action arose does not, of itself, excuse laches in bringing a subsequent suit, if the prior suit was not prosecuted with diligence.

**5. Corporations** ⊜═209—As respects defense of laches as to suit in behalf of corporation, consequences of failure diligently to prosecute prior arbitration are same as if no such agreement was made.

In determining whether a minority stockholder's suit on behalf of corporation is barred by laches, consequences of complainant's failure diligently to prosecute a prior arbitration with defendant are same as if no arbitration agreement had been made.

**6. Corporations** ⊜═209—Minority stockholder, not excusing 12 years' delay in preparing and submitting claims under arbitration agreement, held barred by laches from recovering on claims arising 6 years before suing (Gen. St. Minn. 1923, § 9191).

Where complainant, a minority stockholder of a railroad corporation, and defendant, a connecting railroad, entered into an agreement to arbitrate minority stockholder's claims that officers and majority of directors of complainant's railroad operated complainant's railroad for defendant's benefit, and that the arbitration should be had after a firm of outside ac-

countants should make audit of defendant's books and report to minority stockholder, *held*, that claims arising 6 years before filing of suit were barred by laches, where complainant alleged no facts excusing delay of 12 years in suing, nor gave any reasons why it took accountants 12 years to make investigations and report, nor alleged that defendant hindered or prevented complainant in investigating and preparing its claims, in view of Gen. St. Minn. 1923, § 9191.

**7. Arbitration and award ⬤═══16(4)—In absence of provision for filling vacancies, death of one arbitrator named in agreement and incapacity of other revoked submission.**

Where arbitration agreement named one arbitrator and one alternate, and made no provision for filling vacancies, the death of one arbitrator and the incapacity of the other to act revoked the submission.

**8. Commerce ⬤═══85(5)—Statute held not to authorize Interstate Commerce Commission to award reparations on account of past divisions of joint rate voluntarily established (Transportation Act 1920, § 418, amending Interstate Commerce Act, § 15 [6], being Comp. St. § 8583 [6]).**

Where joint rate was not established pursuant to a finding or order of the Interstate Commerce Commission, the Commission had no authority, under Transportation Act 1920, § 418, amending Interstate Commerce Act, § 15 (6), being Comp. St. § 8583 (6), to award reparations to one of carriers on account of past divisions.

**9. Commerce ⬤═══89—Justness and reasonableness of division of joint rates in future and reparation for unjust divisions in past must first be acted on by Interstate Commerce Commission.**

Questions whether division of joint rates is just, reasonable, or equitable as to future, and reparations for damages sustained on account of unjust, unreasonable, and inequitable divisions in the past, will not be considered by the courts until Interstate Commerce Commission has determined what is a just, reasonable, and equitable division of joint rates between the carriers involved.

**10. Commerce ⬤═══85(5)—Just division of joint rates for future is legislative question, determinable only by Interstate Commerce Commission.**

Question of just, reasonable, and equitable divisions of joint rates for the future is a legislative question, which only the Interstate Commerce Commission may determine.

**11. Commerce ⬤═══87—Interstate Commerce Commission, on complaint of carrier, may determine division of joint rates voluntarily established (Interstate Commerce Act 1887, §§ 1, 13–15, as amended [Comp. St. §§ 8563, 8581–8583]).**

Under Interstate Commerce Act 1887, §§ 1, 13–15, as amended (Comp. St. §§ 8563, 8581–8583), the Interstate Commerce Commission, on complaint of one carrier against another, may determine the division that each is entitled to receive out of their voluntarily established joint rates; it being the intent of Congress to provide relief to a small carrier

from an unjust division imposed on it, because of the domination of a larger connecting carrier.

**12. Commerce ⬤═══87—Minority stockholder of railroad may invoke jurisdiction of Interstate Commerce Commission by filing complaint charging inequitable division of joint rates (Interstate Commerce Act 1887, §§ 1, 13, as amended and re-enacted by Transportation Act 1920, §§ 400, 416 [Comp. St. §§ 8563, 8581]).**

Under Interstate Commerce Act 1887, § 13, as amended and re-enacted by Transportation Act 1920, § 416 (Comp. St. § 8581), minority stockholder of railroad may file a complaint with Interstate Commerce Commission charging an unjust, unreasonable, and inequitable division of joint rates between such stockholder's corporation and other carriers involved, and such a complaint so filed would properly invoke the jurisdiction of the Commission to proceed to investigate the complaint and report in writing its conclusions and decision, order, or requirement in the premises, in view of Interstate Commerce Act 1887, § 1, as amended and substantially re-enacted by Transportation Act 1920, § 400, par. 4 (Comp. St. § 8563).

**13. Public service commissions ⬤═══6—Powers of state commission are limited to those expressly or by fair implication included in authority expressly conferred, and reasonable doubt should be resolved against power.**

The powers of a state commission are special, and limited to such authority as is legally conferred by express provisions of law, or such as is by fair implication and intendment incident to and included in the authority expressly conferred, for the purpose of carrying out and accomplishing objects for which it was created, and any reasonable doubt as to existence of any particular power in the commission should be resolved against the exercise of such power.

**14. Constitutional law ⬤═══62—Legislative power to fix divisions of joint rates may be delegated to state commission.**

Legislative power to fix divisions of joint rates between connecting carriers for the future may be lawfully delegated to a state commission.

**15. Carriers ⬤═══12(2)—State statute authorizing state Railroad and Warehouse Commission to fix joint rates held by implication to authorize commission to fix division of such rates (Gen. St. Minn. 1923, §§ 4638–4641, 4644, 4700).**

Gen. St. Minn. 1923, § 4700, authorizing state Railroad and Warehouse Commission to fix and establish joint rates, *held* by necessary implication to confer power on commission to fix divisions of such rates between the carriers; fixing of each carrier's share being part of the establishing of a joint rate, in view of sections 4638–4641, 4644.

**16. Carriers ⬤═══12(6½)—Minority stockholder of railroad may file complaint with state commission, and on proper showing secure revision of joint intrastate rates and divisions thereof (Gen. St. Minn. 1923, § 4700).**

Under Gen. St. Minn. 1923, § 4700, a minority stockholder of a railroad may file complaint with state Railroad and Warehouse

Commission, and on a proper showing secure a revision of the joint intrastate rates and divisions thereof between stockholder's corporation and other carriers.

**17. Public service commissions ⊜⇒191/2—Fairness of past divisions of joint intrastate rates must be determined by state commission before judicial relief can be granted (Gen. St. Minn. 1923, §§ 4638–4641, 4644, 4700).**

Before complainant can secure judicial relief on account of past divisions of intrastate joint rates, it must first apply to state Railroad and Warehouse Commission, and have the preliminary question of what is a fair division of the rates involved first determined by that commission, in view of Gen. St. Minn. 1923, §§ 4638–4641, 4644, 4700.

Appeal from the District Court of the United States for the District of Minnesota; Joseph W. Molyneaux, Judge.

Action by the Backus-Brooks Company against the Northern Pacific Railway Company and others. Decree for defendants, and plaintiff appeals. Affirmed.

Thomas L. Philips, of St. Louis, Mo., and John Junell, of Minneapolis, Minn. (Ralph Whelan, Koon, Whelan & Hempstead, and Lancaster, Simpson, Junell & Dorsey, all of Minneapolis, Minn., on the brief), for appellant.

Charles Bunn and Thomas D. O'Brien, both of St. Paul, Minn., for appellees.

Before LEWIS and VAN VALKENBURGH, Circuit Judges, and PHILLIPS, District Judge.

PHILLIPS, District Judge. This is a minority stockholder's suit brought in behalf of the Minnesota & International Railway Company (hereinafter called the Minnesota Company), by Backus-Brooks Company, the minority stockholder (hereinafter called complainant), against the Northern Pacific Railway Company (hereinafter called the Northern Pacific), the Minnesota Company, the Minnesota Loan & Trust Company, the Big Fork & International Falls Railway Company (hereinafter called the International Company), C. W. Bunn, F. W. Sweeney, R. W. Clark, R. H. Relf, W. H. Gemmell, Charles Donnelly, Thomas Cooper, Howard Elliott, and J. M. Hannaford. The bill of complaint was filed December 22, 1923.

The Northern Pacific owns and operates a line of railroad extending from Minneapolis and St. Paul to Brainerd, Minn. The Minnesota Company owns and operates a line of railroad from Brainerd to Northome, Minn. This line was completed to Bemidji in 1898, and to Northome in 1903. The Big Fork & Northern Railway Company (hereinafter called the Big Fork Company) owns a line of railroad from Northome to Grand Falls, Minn., which was completed in 1905. The Minnesota Company owns the stock in the Big Fork Company and operates the latter company's line of railway under lease. The International Company owns a line of railroad from Grand Falls to International Falls, which was completed in 1907. The Northern Pacific owns the stock in the International Company. It will be observed that this makes a complete line of railroad from St. Paul to International Falls, and that the Northern Pacific owns the southern terminus and controls through stock ownership the northern terminus thereof.

The matters complained of in the bill may be divided into three classes:

(1) Certain acts and transactions which occurred more than 6 years prior to the filing of the bill, the details of which will be referred to more specifically hereinafter;

(2) The divisions made of earnings on joint line traffic, during the 6-year period immediately prior to the filing of the bill, between the Northern Pacific, the International Company, and the Minnesota Company;

(3) The division of expenses between the Northern Pacific, the International Company and the Minnesota Company upon common operations, and compensation paid each other for services, facilities, use of equipment, repairs of equipment and the like, during the 6-year period immediately prior to the filing of the bill.

The matters falling in class 1, as alleged in the bill and in support of which complainant either adduced or tendered proof, were, in general, these:

That, in the year 1894, the complainant and certain associates acquired all of the capital stock of the Brainerd & Northern Minnesota Railway Company (hereinafter called the Brainerd Company), complainant acquiring 30 per cent., and its associates 70 per cent., of such stock; that in the latter part of the year 1899, or the early part of the year 1900, the Northern Pacific purchased 70 per cent. of the capital stock of the Brainerd Company held by complainant's associates, in violation of an agreement between complainant and its associates not to sell to any person not a stockholder of the Brainerd Company without first offering such stock for sale to the other stockholders; that, to avoid a threatened suit by complainant to set aside such transfer of stock to the Northern Pacific, the Northern Pacific agreed that it would cause the Brainerd Company's line of rail-

way to be extended from its then terminus at Bemidji to the northern boundary line of the state of Minnesota, in accordance with its charter.

That as a part of the consideration for the purchase of the stock of the Brainerd Company the Northern Pacific agreed that the Brainerd Company and its successors would maintain the logging rates then in force to Brainerd from points between Bemidji and Brainerd for a period of 10 years from the date of such purchase; that such rates were unreasonably low and noncompensatory and were maintained until the year 1907.

That in 1901, the Northern Pacific caused the Minnesota Company to be organized for the purpose of building a line of railroad from the then terminus of the Brainerd Company's line at Bemidji to International Falls; that as a result of protest and objection on the part of complainant the stock of the Brainerd Company was exchanged share for share for the stock of the Minnesota Company.

That, in the year 1903, after the Minnesota Company's line had been constructed as far as Northome, Minn., complainant consented to the placing of a mortgage on the Minnesota Company's line, and the issuance of 5 per cent. bonds secured thereby, on the understanding between complainant and the Northern Pacific that the money derived from the sale of such bonds should be applied for the purpose of retiring the then floating indebtedness of the Minnesota Company, and of providing funds for the completion of its line from Northome to Rainy River; that such mortgage was executed July 1, 1903; that such bonds were purchased by the Northern Pacific at a discount of 10 per cent. of their face value; that the proceeds thereof were applied in payment of the floating indebtedness of the Minnesota Company, and the remainder, amounting to $386,854.28, was paid into the treasury of the Minnesota Company; that such last-mentioned sum was not expended in the further extension of the Minnesota Company's line, but in the purchase of securities in which the Northern Pacific was directly or indirectly interested, and on which the Minnesota Company received a lower rate of interest than it was obliged to pay on such bonds.

That, in the year 1905, the Northern Pacific caused the Big Fork Company to be incorporated for the purpose of constructing a line of railroad from Northome to International Falls, Minn.; that thereafter, upon protest and threat of litigation by complain-

ant, the Northern Pacific consented that all the capital stock of the Big Fork Company should be subscribed for and acquired by the Minnesota Company; that the Minnesota Company, out of accumulated net earnings in its treasury, paid such stock subscription in full, and further advanced to the Big Fork Company all the additional moneys with which it constructed a line of railway from Northome to the north bank of the Big Fork river.

That the Northern Pacific at all times subsequent to 1905, refused to permit either the Minnesota Company or its subsidiary, the Big Fork Company, to construct any railroad north of the north bank of the Big Fork river; that in 1906 complainant notified the Northern Pacific in writing that, unless the latter would permit the extension and completion of the lines of the Minnesota Company and Big Fork Company in accordance with the provisions of their charters, complainant would proceed to construct a line of railroad forming an extension of the lines of the Minnesota Company and the Big Fork Company from the north bank of the Big Fork river to International Falls; that in the winter of 1906 and 1907, complainant organized the International Company to construct and operate such railroad, let contracts for the construction of such railroad, and commenced the actual construction thereof; that thereupon the Northern Pacific notified complainant that the Northern Pacific had determined to build a line of railroad to constitute an extension of the lines of the Minnesota Company, the Big Fork Company, and the Northern Pacific from the Big Fork river to International Falls, which would be operated as the only line of railroad interchanging business and traffic with the lines of the Minnesota Company, the Big Fork Company, and the Northern Pacific; that thereupon the complainant, acting under compulsion of circumstances, executed a contract dated December 27, 1906, transferring to the Northern Pacific the International Company and its construction contracts and completed work; that the Northern Pacific then completed the line of the International Company from the Big Fork river to International Falls.

That the Minnesota Company connects with the Minneapolis, St. Paul & Sault Ste. Marie Railway Company at Bemidji, with the Great Northern Railway Company at Bemidji and Walker, Minn., and with the Northern Pacific at Brainerd; that the Northern Pacific has refused to permit the Minnesota Company to engage generally in joint through traffic with lines of railroad other than the

Northern Pacific, and has required it to haul all through freight to Brainerd; that the Minnesota Company could have secured at least as large earnings out of joint through traffic interchanged with its connections at Bemidji and Walker as it received through interchange of such traffic with the Northern Pacific at Brainerd, and derived the benefit of the shorter haul, and that by reason of the Minnesota Company being compelled to interchange joint through traffic exclusively with the Northern Pacific at Brainerd the Minnesota Company was put to additional operating expenses in 1908 of $87,000, 1910 of $108,000, 1912 of $108,000, 1914 of $69,000, and 1916 of $53,800.

That in the year 1913, the Minnesota Company had a line of railroad extending to its own terminals in the northern part of the city of Brainerd, Minn., and a bridge across the Mississippi river at that point; that reconstruction of such bridge became necessary; that the Northern Pacific, instead of permitting such bridge to be rebuilt, caused the Minnesota Company to abandon its line into the northern portion of the city of Brainerd, and to construct a new line extending from a point north of Brainerd to a connection with the Northern Pacific line west of Brainerd, and that by such action, the Minnesota Company was deprived of its own independent entrance to Brainerd, and of access to the location of the only large industry of importance in that city, and that ever since it has been compelled to use the bridge and tracks of the Northern Pacific for the purpose of reaching Brainerd.

That on or about the 6th day of September, 1902, the Northern Pacific caused the Minnesota Company to enter into a contract with the Crookston Lumber Company, which provided, among other things, that the Minnesota Company should furnish the necessary metal materials, for the construction of a branch line of railroad from a connection with the line of the Minnesota Company at the station of Funkley; that the other materials necessary for the construction of such branch line should be furnished and the work of construction should be performed by the Lumber Company; that the Minnesota Company should reimburse the Lumber Company for all expenses incurred by it in the construction of such branch line at the rate of 20 per cent. of the gross earnings accruing to the Minnesota Company north of Bemidji on traffic of such Lumber Company originating on such branch line during each month, and that, when the entire expenditures of such Lumber Company should be reimbursed to it,

such branch line should become the property of the Minnesota Company; that the Minnesota Company should transport logs for the Lumber Company from points on the Minnesota Company's line, or from points on such branch line, to the Lumber Company's mill, or to connection and delivery with the Great Northern Railway, at Bemidji, for transportation to other mills of the Lumber Company, at rates not exceeding 75 cents per thousand feet for hauls of 25 miles or less, and $1 per thousand feet for hauls between 25 and 50 miles, and $1.25 per thousand feet for hauls between 50 and 75 miles; that such rates were unreasonably low, and did not afford adequate compensation to the Minnesota Company; that from the year 1902 to September 1, 1907, the Minnesota Company paid to the Lumber Company, under the provisions of such contract, approximately $35,000; that on or about September 1, 1907, the Northern Pacific caused the Minnesota Company to enter into a further contract with the Lumber Company under the provisions of which the Minnesota Company paid to the Lumber Company the further sum of $85,000 in settlement of the balance alleged to be due the Lumber Company; that the sums paid were greatly in excess of the fair value of the work and labor done and materials and right of way furnished by the Lumber Company in the construction of such branch line; that in such contract of September 1, 1907, the Northern Pacific required and compelled the Minnesota Company to grant to the Lumber Company the right to haul empty cars and cars loaded with logs with its own power over the tracks of the Minnesota Company between the sawmill of such Lumber Company at Lake Bemidji and the connection between the tracks of the Minnesota Company and the tracks of the Great Northern Railway Company at Bemidji for a term beginning on September 1, 1907, and ending July 31, 1914, at a charge of $2 per train of 30 cars maximum; that such compensation was inadequate, and deprived the Minnesota Company of reasonable profits which it could and would otherwise have derived from such traffic and service.

That the Minnesota Company formerly owned and operated a repair shop for the repair of its rolling stock and equipment at Brainerd; that in 1907 the Northern Pacific caused the Minnesota Company to abandon such shop at Brainerd and to enter into an agreement with the Northern Pacific for the making of repairs and the doing of other necessary work in connection with the motive power and equipment of the Minnesota Com-

pany by the Northern Pacific in its shops at Brainerd, at charges which were unreasonable and excessive.

That in December, 1907, the Northern Pacific caused an operating agreement to be entered into between the International Company and the Minnesota Company, by which the latter was to furnish all of the employees, motive power, equipment, tools, and appliances for the operation and maintenance of the line of railway of the International Company, and was to collect and transmit to the Northern Pacific all moneys received for the transportation of freight and passengers over such line, and under which the Minnesota Company was to receive as compensation from the International Company an amount not to exceed the actual expenditures made by the Minnesota Company in such operation and maintenance of the line of the International Company.

That in December, 1907, the Northern Pacific caused to be put into effect a method or system of division of earnings on joint line traffic between the Minnesota Company, the Northern Pacific, and the International Company, which favored the Northern Pacific and the International Company, and was unjust and unfair to the Minnesota Company, and not in keeping with the customary methods of dividing earnings derived from joint traffic between trunk line railroads.

That such operating agreement and such methods for divisions of earnings have been maintained without substantial change since 1907.

The purchase by the Northern Pacific of the stock in the Brainerd Company took place in 1899. The alleged contract to complete the Brainerd Company's line to the northern boundary of Minnesota was superseded by the contract of December 27, 1906. The logging rates complained of were in force from 1900 to 1907. In 1907 a tariff increasing the rates was established and published. The Minnesota Company was organized and succeeded to the franchises and property of the Brainerd Company in 1901. The construction from Northome to Grand Falls was completed in 1905. The Big Fork Company was organized and its stock acquired by the Minnesota Company in 1905. The construction from Grand Falls to International Falls was completed in 1907. This was pursuant to the contract dated December 27, 1906, entered into between the Northern Pacific and the complainant. The first contract with the Crookston Lumber Company was made in 1902. The second contract with the Crookston Lumber Company was made in 1907 and

the last transaction under it took place in 1914. The abandonment of the repair shop at Brainerd took place in 1907. The change in the terminal facilities at Brainerd was made in 1913. This latter change, it may be noted in passing, was approved by Brooks, one of the directors of the Minnesota Company, representing the interests of the complainant, and the action of the board of directors was approved by the unanimous vote of all of the stockholders, including the complainant. The investment of the balance of the funds derived from the bond issue of the Minnesota Company was made in 1903.

The agreements for division of joint earnings and for division of expenses were entered into between the Northern Pacific, the International Company, and the Minnesota Company in 1907, and pursuant to these agreements monthly settlements of joint earnings, of expenses, and of compensation for use of facilities were made over the period extending from 1907 to December, 1917.

On February 20, 1911, the complainant and the Northern Pacific entered into an arbitration agreement. By such agreement, the parties agreed to submit to the final judgment and determination of the arbitrator named, the claims of the complainant that the officers and a majority of the directors of the Minnesota Company had operated the line of railroad of that company for the benefit of the Northern Pacific and the International Company to the detriment and direct loss of the Minnesota Company and its stockholders, and had diverted large sums of money earned by the Minnesota Company into the treasury of the Northern Pacific and the International Company, "largely by unjust and inequitable divisions of revenues and operating and other expenses." It named Hon. Charles F. Amidon, of Fargo, N. D., as arbitrator, and in case of his inability or refusal to act, Hon. Charles A. Willard, of Minneapolis, Minn. It made no other provision for filling a vacancy. It provided that Marwick, Mitchell & Co., a firm of expert accountants, should make an audit of the books and accounts of the Minnesota Company, that in the course of such audit they should have access to the books of the Northern Pacific and the International Company, and that they should make a report to the complainant. It provided that within 60 days after such report had been made the complainant should furnish to counsel for the Northern Pacific, a statement of the respective claims of the Minnesota Company against the Northern Pacific and the International Company, and that within 60 days thereafter the Northern

Pacific and the International Company should make answer thereto, and that upon the issues thus framed the case might be heard under procedure as though in court before a chancellor. It further provided "that the matters in controversy between the respective parties, having been under discussion between their respective counsel since the 1st day of June, 1910, that the rights of all the parties, so far as the same may or might be in any action controlled by any statute of limitations, shall be fixed as of the date of June 1, 1910."

Judge Willard, the alternate arbitrator named, died March 13, 1914. In 1920, Judge Amidon, because of illness, became incapacitated to act as arbitrator.

On February 10, 1923, Mr. Backus, president of the complainant, wrote to the president of the Northern Pacific concerning the arbitration agreement, in part, as follows:

"This agreement, as you will recall, provided for submission to Judge Amidon, or in event of his inability to act to Judge Willard. The latter is now dead, and I understand that the condition of Judge Amidon's health is such as to preclude any possibility of his serving. It has been our thought, however, that rather than undertake to agree upon another arbitrator at this time we would complete the preparation of our statement and contentions and submit them to the Northern Pacific, in the hope that after you have had an opportunity to have them examined we might sit down with you and endeavor to work out a settlement across the table for ourselves, without the intervention of an arbitrator. If this should fail, we can of course go ahead at any time with the arbitration as originally contemplated, by the selection of another arbitrator."

In response thereto, the Northern Pacific, on February 19, 1923, wrote the complainant, in part, as follows:

"I am willing of course to consider with you at any time any claim you may have against the Northern Pacific Company and to pay it if it proves to be valid.

"In view of your letter, however, I think it proper to say to you that we recognize no arbitration agreement as being in effect between us. Twelve years ago we did agree with you to submit to Judge Amidon for decision the claims which you were at that time asserting against us; and we agreed further that, if Judge Amidon were unable to serve, the matter should be submitted to Judge Willard. No action has been taken by you looking to the submission of these questions until now, when the arbitrator agreed upon is incapacitated and the only alternate is dead. What rights you may have against the Northern Pacific I of course am not undertaking to say; but whatever they are, if we cannot agree about them, they cannot be settled under the arbitration agreement of 1911."

The complainants at no time submitted to the Northern Pacific a written statement of the respective claims against the Northern Pacific and the International Company.

On October 9, 1923, complainant notified the Northern Pacific in writing that the final report of the accountants had been received, and that complainant was ready to submit its statement of claims. The Northern Pacific responded thereto by letter dated October 11, 1923, in which it called attention to its prior letter of February 19, 1923, to complainant, and further said:

"I can only repeat that the Northern Pacific will be perfectly willing to consider your claims in the utmost fairness, but whatever these claims are, if we cannot agree about them, they cannot be settled under the arbitration agreement of 1911. It is plain that that agreement is not a general agreement of arbitration at all, but a limited contract to submit to two particular arbitrators and no other arbitrators. One of these is dead and we agree that the other is incapacitated. Our view is for the above and for other reasons that there is no contract of arbitration between us."

To overcome the bar of laches, complainant alleged and either adduced or tendered evidence to prove the following facts: That the complainant and Northern Pacific entered into the arbitration agreement; that during the year 1911 the accountants designated in such agreement made an investigation and furnished what they termed a preliminary statement; that during 1912 and 1913 complainant's attorneys were engaged in investigating the law and ascertaining facts other than those set forth in the auditor's report and in negotiating with the Northern Pacific with a view to adjusting the claims; that early in 1914 complainant employed Mr. B. G. Dahlberg, a traffic expert, to make an investigation of the facts bearing on the matters in controversy; that Dahlberg undertook the work, and on December 19, 1914, furnished complainant with certain statistics and an analysis of the situation; that complainant then renewed discussions with the Northern Pacific with a view of compromise; that on December 27, 1914, Dahlberg recommended that additional information be obtained; that Dahlberg and complainant's attorneys pursued their investigations during

1915; that early in 1916 Dahlberg advised a further investigation for the purpose of obtaining additional information; that in June 1916, the accountants were instructed to obtain additional information, and that throughout the remainder of the year 1916 such accountants worked continuously on the books and records; that in 1914 complainant found it necessary to have the services of an attorney with expert knowledge of the questions involved in the controversy, and employed Thomas L. Phillips, Esq.; that in the fall of 1916 the investigations were temporarily suspended because of the pendency of a proceeding before the Railway and Warehouse Commission of Minnesota; that in December, 1916, Judge Amidon was interviewed and expressed his willingness to serve as arbitrator; that on or about February 1, 1917, the president and active managing officer of the complainant was taken seriously ill, and for an extended period thereafter could not give complainant's affairs the attention which they required; that, because of the illness of such president, Dahlberg was required to take over and perform many new duties in connection with the management of the complainant; that in the month of August, 1918, complainant employed William N. Webb as a traffic expert; that he made investigations during the latter part of the year 1918, and during the early part of the year 1919; that he suspended for a time and again renewed his investigation in October, 1920; that on January 1, 1918, the federal government took over the roads of the Northern Pacific and the Minnesota Company, and that such roads were thereafter operated under federal control until on or about March 1, 1920; that in March, 1922, the auditors advised the Northern Pacific that they desired to bring their audit down to date, and that the Northern Pacific in response thereto advised them that they might have access for that purpose to the books and records of the Northern Pacific and Minnesota Company.

That the Northern Pacific had knowledge from time to time that the complainant was pursuing such investigation and was making such examination of the records.

A careful examination of the record shows no act or statement by the Northern Pacific recognizing the arbitration agreement as in force and effect after the year 1916.

All of the matters falling in class 3 were voluntarily dismissed therefrom by counsel for complainant at the close of the case.

At the conclusion of the evidence adduced or offered in behalf of the complainant, the court held that all of the matters falling in class 1 were barred by laches; that the matters complained of with reference to the division of earnings were within the jurisdiction of either the Interstate Commerce Commission or the Minnesota Railroad and Warehouse Commission, and that the court had no primary jurisdiction over such matters. For the reasons above stated the court dismissed the bill. This is an appeal from the decree of dismissal.

As stated at the outset, this is a stockholder's suit prosecuted by a minority stockholder in behalf of the corporation predicated upon the proposition that the Northern Pacific elects and dominates a majority of the board of directors of the Minnesota Company, and that in the transactions complained of such majority of the board of directors has failed to serve faithfully the interests of the Minnesota Company and has managed and operated that company, not for the benefit of its stockholders, but for the benefit of the Northern Pacific. There is no question of concealment or want of knowledge in the case. The allegations of the bill and the offers of proof affirmatively show that the minority stockholder here complaining has had complete knowledge of all the matters complained of since their inception.

[1] Counsel for the respondents contend that the alleged matters complained of for which a cause of action accrued more than 6 years prior to the filing of the bill are barred by the statute of limitation of the state of Minnesota. Gen. Stat. Minn. 1923, § 9191. They assert that this suit is within the concurrent, and not the exclusive, equity jurisdiction, and that courts of equity in cases of concurrent jurisdiction consider themselves bound by the statutes of limitation which govern actions at law. They cite in support of their contention, Kelly v. Dolan (C. C. A. 3) 233 F. 635; Metropolitan Bank v. St. Louis Despatch Co., 149 U. S. 436, 13 S. Ct. 944, 37 L. Ed. 799; Baker v. Cummings, 169 U. S. 189, 18 S. Ct. 367, 42 L. Ed. 711. The alleged wrongs complained of were wrongs against the Minnesota Company in which the complainant is a stockholder, and except through the corporation such wrongs had no relation to complainant. They did not directly injure complainant. Complainant was not affected by such wrongs except as every other stockholder was affected. There is no direct legal privity between the complainant, either individually or as a stockholder, and the respondents. As such stockholder, the complainant has an interest in the Minnesota Company and in the conduct of its officers affecting its property, but this interest is

equitable, and not legal, and it gives the complainant no standing in a court of law. Consequently the complainant cannot enforce a cause of action in behalf of the Minnesota Company in an action at law. His sole remedy is in equity. Smith v. Hurd, 12 Metc. (Mass.) 371, 384–386, 46 Am. Dec. 690; Peabody v. Flint, 6 Allen (Mass.) 52, 55–57; Converse v. United Shoe Machinery Co., 185 Mass. 422, 70 N. E. 444; Jenkins v. Bradley, 104 Wis. 540, 80 N. W. 1025, 1028; Moran v. Vreeland, 81 Misc. Rep. 664, 143 N. Y. S. 522, 526; United Copper Securities Co. v. Amalgamated Copper Co. (C. C. A. 2) 223 F. 421, L. R. A. 1917E, 1004; Id., 244 U. S. 261, 264, 37 S. Ct. 509, 61 L. Ed. 1119; Hawes v. Oakland, 104 U. S. 450, 464, 26 L. Ed. 827; Hirsh v. Jones (C. C.) 56 F. 137, 138; Ames v. American T. & T. Co. (C. C.) 166 F. 820, 822; Fletcher, Cyclopedia Corporations, vol. 6, p. 6868, § 4052; 14 C. J. p. 938, § 1457; 14a C. J. p. 156, § 1935.

The interest which the complainant seeks to enforce and protect is equitable. It is the existence of this interest which enables complainant to invoke the jurisdiction and aid of a court of equity. Complainant's sole remedy for the protection of his equitable interest under the circumstances is in equity. Therefore, we think the case falls within the exclusive, rather than the concurrent jurisdiction of equity. Pomeroy's Equity Jurisprudence (4th Ed.) vol. 1, §§ 136, 137, 138, 146, 151.

No doubt the right of a stockholder to maintain a suit in equity in behalf of the corporation after the running of the statute of limitations should be limited to extraordinary cases where there are unusually strong equities in favor of the complainant. We think it not difficult, however, to conceive of such a case. Suppose the same persons constituted the officers and directors of two corporations, that they were unfaithful to their trust in respect to one of the corporations and carried out a transaction to the detriment of such corporation, and for the benefit of the other corporation, and that they concealed such transaction from the stockholders of the injured corporation until after the running of the statute of limitations: Could it be said that a stockholder of such injured corporation on discovery of the facts could not obtain relief from such a transaction in a court of equity? We think not. For these reasons, we believe that the principles of the doctrine of laches, and not the provisions of the statute of limitations, should condition the time within which a stockholder must commence such a suit in behalf of the corporation.

Is the complainant barred by the doctrine of laches from complaining of wrongs which occurred more than six years prior to the filing of the bill?

The general principles which control the application of the doctrine of laches were stated by Judge Sanborn in Kelley v. Boettcher (C. C. A. 8) 85 F. 55, 62, as follows:

"In the application of the doctrine of laches, the settled rule is that courts of equity are not bound by, but that they usually act, or refuse to act in analogy to, the statute of limitations relating to actions at law of like character. Rugan v. Sabin, 53 F. 415, 420, 10 U. S. App. 519, 534, 3 C. C. A. 578, 582; Billings v. Smelting Co., 51 F. 338, 349, 10 U. S. App. 1, 62, 2 C. C. A. 252, 262, 263; Bogan v. Mortgage Co., 63 F. 192, 199, 27 U. S. App. 346, 357, 11 C. C. A. 128, 135; Kinne v. Webb, 54 F. 34, 40, 12 U. S. App. 137, 148, 4 C. C. A. 170, 177; Scheftel v. Hays, 58 F. 457, 460, 19 U. S. App. 220, 226, 7 C. C. A. 308, 312; Wagner v. Baird, 7 How. 234, 258 [12 L. Ed. 681]; Godden v. Kimmell, 99 U. S. 201, 210 [25 L. Ed. 431]; Wood v. Carpenter, 101 U. S. 135, 139 [25 L. Ed. 807]. The meaning of this rule is that, under ordinary circumstances, a suit in equity will not be stayed for laches before, and will be stayed after the time fixed by the analogous statute of limitations at law; but if unusual conditions or extraordinary circumstances make it inequitable to allow the prosecution of a suit after a briefer, or to forbid its maintenance after a longer, period than that fixed by the statute, the chancellor will not be bound by the statute, but will determine the extraordinary case in accordance with the equities which condition it. * * * When a suit is brought within the time fixed by the analogous statute, the burden is on the defendant to show, either from the face of the bill or by his answer, that extraordinary circumstances exist which require the application of the doctrine of laches; and, when such a suit is brought after the statutory time has elapsed, the burden is on the complainant to show, by suitable averments in his bill, that it would be inequitable to apply it to his case."

See, also, Wilson v. Plutus Mining Co. (C. C. A. 8) 174 F. 317, 320; Taylor v. Salt Creek Consol. Oil Co. (C. C. A. 8) 285 F. 532, 540, 541; Mason v. MacFadden (C. C. A. 8) 298 F. 384, 390; 21 C. J. § 251, pp. 251–254.

[2] It is well settled that a stockholder who undertakes to sue on behalf of the corpora-

tion must act promptly after acquiring knowledge of the conditions of which he complains, and that if he stands by with knowledge of the facts for an unreasonable time, his right to maintain such a suit will be barred by laches. Fletcher, Cyclopedia Corporations, vol. 6, pp. 6948, 6955, § 4072; 14 C. J. p. 938, § 1459; Whitaker v. Whitaker Iron Co. (D. C.) 238 F. 980, 995; Alexander v. Searcy, 81 Ga. 536, 8 S. E. 630, 633, 634, 12 Am. St. Rep. 337.

[3] In the instant case, all of the alleged wrongs falling in class 1 occurred more than 6 years prior to the filing of the bill. The burden, therefore, rested upon the complainant to aver and prove facts which would make it inequitable to apply thereto the doctrine of laches.

[4, 5] It is well settled that the mere institution of a prior suit without undue delay after the cause of action arose does not of itself excuse laches in bringing a subsequent suit, if the prior suit was not prosecuted with diligence. Taylor v. Salt Creek Consolidated Oil Co. (C. C. A. 8) 285 F. 532, 542; Mason v. MacFadden (C. C. A. 8) 298 F. 384, 392. In the latter case, the court said: "It has frequently been held by the courts that, if a party fail in the diligent prosecution of action brought, the consequences, as far as laches is concerned, are the same as if the suit had never been brought." It must be equally true, in determining the question of whether the present suit is barred by laches, that, if the arbitration was not prosecuted by the complainant with diligence, the consequences are the same as if no arbitration agreement had ever been made.

[6, 7] As stated above, for the purpose of overcoming the defense of laches, complainant alleged the making of the arbitration agreement and the time consumed by it in examinations and investigations preparatory to its submitting its claims under such agreement. It is our judgment that complainant wholly failed to excuse the long delay. It assigns no reason why it took the accountants 12 years to make their examination and report. It does not allege that the Northern Pacific in any wise hindered or prevented the complainants in their investigation and preparation of their claims. On the contrary, it shows complainant was accorded full opportunity for examination and investigation of the books and records. It shows no recognition by the Northern Pacific that the arbitration agreement was in force and effect after 1916. Although one of the arbitrators named died in 1914, and the other became incapacitated in 1920, it shows no agreement supplemental to the arbitration agreement providing for a new arbitrator after one of those named had died, and the other had become wholly incapacitated. Since the arbitration agreement made no provision for filling vacancies, the death of one arbitrator and the inability of the other arbitrator to act revoked the submission. Wolf v. Augustine, 181 Pa. 576, 37 A. 574, 576; Parsons v. Ambos, 121 Ga. 98, 48 S. E. 696, 698; Dinsmore v. Hanson, 48 N. H. 413; Sutton v. Tyrrell, 10 Vt. 91; Potter v. Sterrett, 24 Pa. 411, 412. It follows that the arbitration agreement came to an end in the year 1920.

Continuously from the year 1907 monthly settlements of joint earnings of expenses and of compensation for use of facilities had been made between the Minnesota Company, the Northern Pacific and the International Company. The Northern Pacific and the International Company had made reports and had paid dividends and taxes upon the basis of the transactions complained of over a period of fifteen years. During that period stock and securities of the Northern Pacific frequently changed hands, and there are no means of adjusting the equities growing out of such changes. Peabody v. Flint, 6 Allen (Mass.) 52, 57. A reading of the bill, together with parts of Dahlberg's testimony, indicates that the complainant entered upon a "fishing expedition," with no definite conception of its legal rights, if any it had, largely for the purpose of keeping up an assumed show of litigation, meanwhile hoping, if not expecting, to effect some sort of settlement and adjustment whereby it would receive concessions from the Northern Pacific made in order to get rid of the annoyance of controversy or litigation. The record teems with evidence of dalliance and lack of diligence. It shows inexcusable delay and laches, and in our judgment evinces no facts showing unusual conditions or extraordinary circumstances which would make it inequitable for a court of equity to deny relief because of laches as to the matters which occurred more than 6 years prior to the filing of the bill.

The final question presented is whether the court had original jurisdiction to determine what would be a just, reasonable and equitable division of joint rates between the Minnesota Company and the Northern Pacific, and to grant relief to the Minnesota Company on account of past division of earnings from joint line traffic in the event it found the division of joint rates unfair, for the period of 6 years immediately prior to the filing of the bill.

The contentions of counsel for the complainant, as we understand them, are these:

(1) That the fixing of past damages is not legislative, but judicial, and is a proper subject for judicial action;

(2) That prior to the Transportation Act of 1920 the power of the Interstate Commerce Commission to fix divisions was limited to cases where it had previously fixed the joint through rate and where the carriers were in formal disagreement on the subject;

(3) That the complainant could not invoke the action of either the Interstate Commerce Commission or the Minnesota Railroad and Warehouse Commission in behalf of the Minnesota Company;

(4) That neither the Interstate Commerce Commission nor the Minnesota Railroad and Warehouse Commission has power to fix divisions of intrastate joint rates.

## 1. Divisions of Interstate Joint Rates.

Counsel in their brief have divided the period, so far as interstate joint rates are concerned, into two parts, namely, the period from December 23, 1917, to February 28, 1920, the date when the Transportation Act of 1920 went into force and effect, and the period from the latter date to December 22, 1923, the date when the bill was filed.

For the reasons hereinafter stated, we doubt that the extent of the power of the Interstate Commerce Commission prior to the Transportation Act of 1920 (41 Stat. 456) to fix divisions of joint interstate rates is material to a determination of this case.

Section 15 (6), Act of 1920 (section 8583 [6] U. S. Comp. St. 1923 Supp.), reads as follows:

"Whenever, after full hearing upon complaint or upon its own initiative, the Commission is of opinion that the divisions of joint rates, fares, or charges, applicable to the transportation of passengers or property, are or will be unjust, unreasonable, inequitable, or unduly preferential or prejudicial as between the carriers parties thereto (whether agreed upon by such carriers, or any of them, or otherwise established), the Commission shall by order prescribe the just, reasonable, and equitable divisions thereof to be received by the several carriers, and in cases where the joint rate, fare, or charge was established pursuant to a finding or order of the Commission and the divisions thereof are found by it to have been unjust, unreasonable, or inequitable, or unduly preferential or prejudicial, the Commission may also by order determine what (for the period subsequent to the filing of the complaint or petition or the making of the order of investigation) would have been the just, reasonable, and equitable divisions thereof to be received by the several carriers, and require adjustment to be made in accordance therewith. In so prescribing and determining the divisions of joint rates, fares and charges, the Commission shall give due consideration, among other things, to the efficiency with which the carriers concerned are operated, the amount of revenue required to pay their respective operating expenses, taxes, and a fair return on their railway property held for and used in the service of transportation, and the importance to the public of the transportation services of such carriers; and also whether any particular participating carrier is an originating, intermediate, or delivering line, and any other fact or circumstance which would ordinarily, without regard to the mileage haul, entitle one carrier to a greater or less proportion than another carrier of the joint rate, fair or charge."

[8] It is clear that under this section the Interstate Commerce Commission, either upon complaint or upon its own initiative, has the power to enter into a hearing and to prescribe a just, reasonable and equitable division of joint rates. Counsel for complainant contend, however, as above stated, that under the provisions of this section the Commission may only prescribe just, reasonable, and equitable divisions for the future. The language of the act seems to limit an award for reparation to cases where the Commission has theretofore established the joint through rate, and to the period subsequent to the date of the filing of the complaint or the initiation of the investigation by the Commission, as the case may be. In the case of Pittsburgh & W. Va. Ry. Co. v. Pittsburgh & L. E. R. R. Co., 61 Interst. Com. Com'n R. 272, the Commission, after quoting paragraph 6 of section 15, supra, said:

"The provisions above quoted of the interstate commerce act leave no doubt as to our power to prescribe 'just, reasonable, and equitable divisions' for the future or that the intent of the present law is to limit reparation (a) to cases 'where the joint rate, fare, or charge was established pursuant to a finding or order of the Commission' and (b) to the 'period subsequent to the filing of the complaint or petition or the making of the order of investigation.' "

Since the joint rate in the instant case was not established pursuant to a finding or order of the Commission, it follows that the Commission has no authority under the Transportation Act of 1920 to award reparations to

the Minnesota Company on account of past divisions.

[9] We fail, however, to see how this interpretation of the Transportation Act of 1920 in any wise aids complainant. The preliminary and fundamental inquiry is what is a reasonable and just division? This preliminary and fundamental question the Commission alone may determine.

In United States v. Louisville & Nashville R. R. Co., 235 U. S. 314, 320, 35 S. Ct. 113, 114 (59 L. Ed. 245), the court said:

"It is not disputable that from the beginning the very purpose for which the Commission was created was to bring into existence a body which from its peculiar character would be most fitted to primarily decide whether from facts, disputed or undisputed, in a given case preference or discrimination existed."

In the case of Terminal R. R. Ass'n v. U. S., 266 U. S. 17, 45 S. Ct. 5, 69 L. Ed. 150, the court said:

"The making of rates is a legislative and not a judicial function. Keller v. Potomac Electric Co., 261 U. S. 428, 440 [43 S. Ct. 445, 67 L. Ed. 731]; Ohio Valley Co. v. Ben Avon Borough, 253 U. S. 287, 289 [40 S. Ct. 527, 64 L. Ed. 908]; Louisville & Nashville R. R. Co. v. Garrett, 231 U. S. 298, 305 [34 S. Ct. 48, 58 L. Ed. 229]; Interstate Commerce Commission v. Humboldt S. S. Co., 224 U. S. 474, 483 [32 S. Ct. 556, 56 L. Ed. 849]; Prentis v. Atlantic Coast Line Co., 211 U. S. 210, 226 [29 S. Ct. 67, 53 L. Ed. 150]. The division of joint rates is also legislative in character. The Interstate Commerce Commission is authorized to establish through routes and joint rates and to prescribe conditions upon which such routes shall be operated, and to fix divisions of such rates among carriers. Section 15 (1), (3), (6), Interstate Commerce Act [as amended by Act Feb. 28, 1920]; section 418, c. 91, 41 Stat. 485, 486 [Comp. St. § 8583]. It is well settled as a general rule that the question of the reasonableness of rates or of divisions of joint rates will not be considered by the courts before application has been made to the Commission. Texas & Pacific Ry. v. Abilene Cotton Oil Co., 204 U. S. 426, 440 [27 S. Ct. 350, 51 L. Ed. 553, 9 Ann. Cas. 1075]; Robinson v. Baltimore & Ohio R. R., 222 U. S. 506 [32 S. Ct. 114, 56 L. Ed. 288]; Mitchell Coal Co. v. Pennsylvania R. R. Co., 230 U. S. 247, 254–261 [33 S. Ct. 916, 57 L. Ed. 1472]; Skinner & Eddy Corporation v. United States, 249 U. S. 557, 562 [39 S. Ct. 375, 63 L. Ed. 772]; United States v. Abilene &

Southern Ry. Co., 265 U. S. 274 [44 S. Ct. 565, 68 L. Ed. 1016]."

In Great Northern Ry. Co. v. Merchants' Elevator Co., 259 U. S. 285, 42 S. Ct. 477, 66 L. Ed. 943, the court said:

"Whenever a rate, rule or practice is attacked as unreasonable or as unjustly discriminatory, there must be preliminary resort to the Commission. Sometimes this is required because the function being exercised is in its nature administrative in contradistinction to judicial. But ordinarily the determining factor is not the character of the function, but the character of the controverted question and the nature of the inquiry necessary for its solution. To determine what rate, rule or practice shall be deemed reasonable for the future is a legislative or administrative function. To determine whether a shipper has in the past been wronged by the exaction of an unreasonable or discriminatory rate is a judicial function. Preliminary resort to the Commission is required alike in the two classes of cases. It is required because the inquiry is essentially one of fact and of discretion in technical matters; and uniformity can be secured only if its determination is left to the Commission. Moreover, that determination is reached ordinarily upon voluminous and conflicting evidence, for the adequate appreciation of which acquaintance with many intricate facts of transportation is indispensable; and such acquaintance is commonly to be found only in a body of experts."

The relief which the complainant here seeks so far as divisions of joint interstate rates are concerned is two-fold: Relief in the future from an alleged unjust, unreasonable, and inequitable division between the Minnesota Company and the other carriers involved, and reparation for damages suffered on account of alleged unjust, unreasonable, and inequitable divisions in the past. It is clear upon the authority of Great Northern Ry. v. Elevator Co., supra, that in both cases preliminary resort to the Commission is required. When the Commission has determined the preliminary and fundamental question of what is a just, reasonable and equitable division of the joint rate, the court, predicating its action upon that fundamental fact, may, in the exercise of a proper judicial function, grant relief for the past wrongs. It follows that, in order for the Minnesota Company to obtain the relief it here seeks, it must first invoke the aid of the Interstate Commerce Commission, and secure a determination of what is a just, reasonable, and

equitable division of the joint rates between it and the other carriers involved.

[10] This is true because the question of just, reasonable, and equitable divisions for the future is a legislative question, which only the Commission may determine, and because the preliminary determination of that question is a prerequisite to the right to obtain judicial relief for past wrongs. It logically follows that, since the power of the Commission to determine this preliminary and fundamental question existed when the bill was filed, and when the matter came on for hearing before the trial court, the Minnesota Company should have first invoked the aid of the Commission to have such question determined and then sought judicial relief for damages resulting from unjust, unreasonable, and inequitable divisions in the past, in so far as such relief was not then barred by limitation or laches. We fail to see why this should be limited to the period subsequent to the date the Transportation Act of 1920 went into force and effect, and for that reason, as stated above, doubt the necessity of determining the powers of the Commission prior to the Transportation Act of 1920.

[11] However, we have concluded, if it is material to go into that question, that the Minnesota Company might have invoked the jurisdiction of the Interstate Commerce Commission for the purpose of determining what was a just, reasonable, and equitable division of the joint rates involved prior to the Transportation Act of 1920.

Section 15 of the Act of February 4, 1887, as amended by the act of June 29, 1906, § 4, and Act of June 18, 1910, § 12 (section 8583, U. S. Comp. St. 1916), in part, provides:

"Whenever the carrier or carriers, in obedience to such order of the Commission or otherwise, in respect to joint rates, fares, or charges, shall fail to agree among themselves upon the apportionment or division thereof the Commission may, after hearing, make a supplemental order prescribing the just and reasonable proportion of such joint rate to be received by each carrier party thereto, which order shall take effect as a part of the original order."

"The Commission may also, after hearing, on a complaint or upon its own initiative without complaint, establish through routes and joint classifications, and may establish joint rates as the maximum to be charged and may prescribe the division of such rates as hereinbefore provided and the terms and conditions under which such through routes shall be operated, whenever the carriers themselves shall have refused or neglected to establish voluntarily such through routes or joint classifications or joint rates."

It is the contention of counsel for the complainant that under these provisions the power of the Commission to fix divisions is limited to cases where the Commission has established the joint rate involved, and where the carriers have failed to agree among themselves upon the apportionment or division of such joint rates. If the sole power of the Commission to fix divisions was found in the language above quoted, we might be inclined to agree with counsel for complainant. We think, however, that jurisdiction to fix divisions under the circumstances existing in the instant case is found in other provisions of the Act to Regulate Commerce, and the amendments thereto.

Section 1 of the Act of February 4, 1887, as amended (section 8563, U. S. Comp. St. 1916), in part reads as follows:

"It shall be the duty of every carrier subject to the provisions of this act * * * to establish through routes and just and reasonable rates applicable thereto, and to provide reasonable facilities for operating such through routes and to make reasonable rules and regulations with respect to the exchange, interchange, and return of cars used therein, and for the operation of such through routes, and *providing for reasonable compensation to those entitled thereto.*" (Italics ours.)

Section 13 of the Act of February 4, 1887, as amended (section 8581, U. S. Comp. St. 1916), provides that any person or any common carrier complaining of anything done or omitted to be done by any common carrier subject to the provisions of the act, may apply to the Commission by petition, and provides that the Commission may enter into an investigation of the matters complained of.

Section 14 of the Act of February 4, 1887, as amended (section 8582, U. S. Comp. St. 1916), provides that the Commission after investigation shall make a report, together with its decision, order, or requirement in the premises.

In the Morgantown & Kingwood Divisions Case, 49 Interst. Com. Com'n R. 540, the Interstate Commerce Commission had before it the precise question now under consideration, under a state of facts not materially different from the facts alleged in this case. There, a small carrier owning a short line with but one trunk line connection had become dissatisfied with the divisions allowed it by its one trunk line connection, and sought the aid of the Commission to obtain relief

therefrom. In the course of the opinion, the Commission said:

"The general principles controlling the division of joint rates have long been fairly well settled among the carriers, and they usually have no difficulty in arriving at a satisfactory understanding. The larger lines can give and take and therefore have a ready basis for negotiating and reaching an agreement. The shorter lines with more than one trunk line connection are also in a favorable position for protecting themselves by playing one connecting line against the other in the negotiations. It occasionally happens, however, as in this case, that a short line with but one outlet becomes dissatisfied with the divisions allowed it by its one trunk line connection and is unable to secure a readjustment."

After quoting section 1, supra, the Commission further said:

"This is the substantive law respecting through routes and rates; and when a through route is opened by publishing a joint through rate between two points that provision gives an express legislative assurance of 'reasonable compensation' out of the joint rate 'to those entitled thereto,' namely, to the several carriers furnishing the tracks, stations, motive power, equipment, and performing the service in operating the route. It also imposes upon the controlling carrier in a through route the 'duty' of according out of the joint rate 'reasonable compensation' to the other carriers 'entitled thereto.' But in negotiating with a powerful connecting line for its division of such a joint rate a short line, originating freight of a competitive character and having no other outlet to the markets, is at a disadvantage and may be compelled temporarily to accede to an unfair division. In such cases the agreement is coerced by the circumstances. The division accepted under such conditions stands on no better footing. however, than does an unreasonable rate that must be paid by a shipper because it is the legally established rate. Section 1 gives the shipper a right to a reasonable rate and with equal directness, in the provision just quoted, it gives the small line the right to receive 'reasonable compensation' out of any joint rate applicable over a through route which it may operate conjointly with a trunk line connection. The act in this particular enforces justice as between carriers as to the reasonableness of divisions no less than it requires justice between carriers and the shippers in respect of the reasonableness of rates. It also affords carriers a remedy against oppression in such a case as clearly as it gives the shipper a remedy against an excessive rate.

"Section 12 [Comp. St. § 8576] authorizes and requires the Commission to execute and enforce the provisions of the act. In section 13 it is provided—

"'That any person, * * * or any common carrier, complaining of anything done or omitted to be done by any common carrier subject to the provisions of this act, in contravention of the provisions thereof, may apply to said Commission by petition, which shall briefly state the facts; * * * if such carrier or carriers shall not satisfy the complaint within the time specified, or there shall appear to be any reasonable ground for investigating said complaint, it shall be the duty of the Commission to investigate the matters complained of in such manner and by such means as it shall deem proper.'

"A carrier is here given the right to complain of another carrier with respect to anything done in contravention of the act. This right is conferred affirmatively and in express terms; and in the complaint before us the Morgantown & Kingwood in effect alleges that the defendant denies it the 'reasonable compensation' to which it is 'entitled' out of the joint rates in effect over the through routes which the two lines together are operating. The defendant has not satisfied the complaint and it follows from the provision last quoted that the Commission is under 'the duty * * * to investigate the matters complained of.' Having made the investigation, section 14 provides that it shall be the Commission's duty 'to make a report in writing' stating its 'conclusions * * * together with its decision, order, or requirement in the premises.'

"Under these powers we think it clear that the Commission may find that the substantive law in section 1 has been violated by the defendant in failing to accord the complainant 'reasonable compensation' out of the joint rates voluntarily established by the two lines, and in doing so may, under its general powers, fix the divisions so as to give 'reasonable compensation' to each of the carriers operating these through routes.

"Even if the words 'or otherwise' be read out of section 15 as having no meaning, that provision in the act can be regarded only as a limitation upon the power of the Commission, when fixing a joint through rate, to initiate the divisions of it. Such a joint rate is established by the Commission usually upon the complaint of a shipper; but the apportionment of it is ordinarily a matter of in-

terest only to the participating carriers. They should therefore have an opportunity to negotiate and agree among themselves upon their divisions. And so the law provides that only in case of a disagreement may the Commission adjudicate their differences, doing so, for convenience and expedition, by a supplemental order in the same proceeding in which the joint rate has been fixed and without the necessity of a new complaint and a new proceeding. But it would indeed be a strained construction of the statute to hold that this special procedure for apportioning a joint rate, fixed by the Commission upon a shipper's complaint, has the effect of annulling another provision in the act giving a carrier a definite right to invoke the Commission's protection against oppression and injustice arising out of something done by another carrier 'in contravention of the provisions' of the act.

"The act in affirmative and specific language provides, as pointed out, 'reasonable compensation' to this complainant for its service in the through routes it operates with the defendant under their established joint rates; and for a denial to it by the defendant of such a reasonable apportionment the act, in the several provisions alluded to, affords the complainant a right, as we have seen, to have the matter complained of investigated by the Commission; a remedy, which in our judgment is also legislatively recognized by the incorporation of the words 'or otherwise' in section 15, as hereinbefore explained. Not only is a remedy provided in the act against an unreasonable demand, in the apportionment of a joint rate established under the Commission's order, but in voluntarily opening through routes and making joint rates applicable over them 'those entitled thereto,' namely, a participating line like this complainant, may insist that 'reasonable compensation' shall be paid to it out of the joint rates. It is not only our order that must be obeyed but the statute also must be obeyed.

"This construction of the act gives effect to all its provisions. Speaking for the court in Texas & Pacific Ry. Co. v. Abilene Cotton Oil Co., 204 U. S. 426, 442, 443 [27 S. Ct. 350, 51 L. Ed. 553, 9 Ann. Cas. 1075], the present Chief Justice pointed out that every provision must be 'read in connection with the context of the act' and that if 'the general terms of the section when taken alone might sanction' a conclusion destructive of certain rights conferred in other parts of the act, the context must be considered and the general terms be so construed as to give full effect to the entire act. 'The act cannot be held to destroy itself.' That principle is controlling here. The right of one carrier, conferred in the sections mentioned, to complain of another carrier, because of a denial to it by the latter, in contravention of the act, of 'reasonable compensation' out of their joint rates, may not be destroyed by a technical construction of certain terms in the provisions of section 15 relating to proceedings in which the Commission is asked to establish through routes and joint rates under its order. The two rights must stand together and be administered by the Commission, when called upon, in such a way as to compel carriers, in every contingency where the act opens a way, to obey the substantive law of the act."

The Commission reaffirmed this decision in Pittsburgh & West Va. Ry. Co. v. Pittsburgh & L. E. R. Co., supra, and in Western Pacific R. R. Co. v. Southern Pacific Co., 55 I. C. C. 71, at pages 73, 74.

We agree with the reasoning and the conclusion of the Commission in the opinion last above quoted. We think it was the intent of Congress to provide relief to a small carrier from an unjust division imposed upon it because of the domination of a larger carrier with which it connected.

[12] Counsel for complainant contend, however, that even if the Minnesota Company could invoke the aid of the Commission either under the Act to Regulate Commerce, as amended, or the Transportation Act of 1920, that its minority stockholders were powerless to do so, and therefore their sole relief was in a court of equity. They cite, in support of this contention, Manning v. Chicago & Alton R. R. Co.; 13 I. C. C. 125. It is true in that case the petition was filed by a stockholder of the Louisiana & Missouri Railroad Company, and that the Commission dismissed the petition. It dismissed it, however, not because of want of a proper party complainant, but because the complaint alleged no violation of the Act to Regulate Commerce. At page 127 of the report the Commission said:

"Without reciting the various matters of which complaint may be made as provided in this section, it is clear that the facts alleged in the petition in this case and above stated do not disclose the violation of any provision of the regulating statute. Whatever may be the equities of complainant as a minority stockholder of the old Missouri Company, he fails to show that anything has been done by defendants which the act prohibits or anything omitted which the act enjoins. In other words, nothing is alleged or

made to appear which would give the Commission jurisdiction to make a corrective order. It follows that complainant is not entitled to maintain this proceeding and his petition should therefore be dismissed."

We think it clear that, if the Northern Pacific through its power and domination imposed an unfair and unjust division on the Minnesota Company and one that did not provide reasonable compensation out of the joint rates to the Minnesota Company, such action constituted a violation of the Act to Regulate Commerce under the decision in the Morgantown & Kingwood Divisions Case.

The provisions of section 1, as amended, of the Act to Regulate Commerce, quoted above, were substantially re-enacted by the provisions of paragraph 4 of section 400 of the Transportation Act of 1920. Section 8563 (4), 1923 Supp. U. S. Comp. St.

Section 13 of the Act of February 4, 1887, as amended (section 8581, U. S. Comp. St. 1916), reads as follows:

"Any person, firm, corporation, company, or association, * * * or any common carrier, complaining of anything done or omitted to be done by any common carrier subject to the provisions of this act, in contravention of the provisions thereof, may apply to said Commission by petition, which shall briefly state the facts; whereupon a statement of the complaint thus made shall be forwarded by the Commission to such common carrier, who shall be called upon to satisfy the complaint, or to answer the same in writing, within a reasonable time, to be specified by the Commission. If such common carrier within the time specified shall make reparation for the injury alleged to have been done, the common carrier shall be relieved of liability to the complainant only for the particular violation of law thus complained of. If such carrier or carriers shall not satisfy the complaint within the time specified, or there shall appear to be any reasonable ground for investigating said complaint, it shall be the duty of the Commission to investigate the matters complained of in such manner and by such means as it shall deem proper.

" * * * No complaint shall at any time be dismissed because of the absence of direct damage to the complainant."

This section was re-enacted by the Transportation Act of 1920 (section 8581, U. S. Comp. St. 1923 Supp.).

In the case of Interstate Commerce Commission v. Baird, 194 U. S. 25, 39, 24 S. Ct. 563, 567 (48 L. Ed. 860), the court said:

"It is urged that the complainant before the Commission did not show any real interest in the case brought, and that the proceeding should for that reason have been dismissed. It is provided in the Act to Regulate Commerce, § 13, that 'any person, firm, corporation,' etc., complaining of anything done or omitted to be done by any common carrier subject to the provisions of this act in contravention of the provisions thereof may apply to said Commission by petition, etc. And certain procedure is provided for—and [said Commission] 'may institute any inquiry on its own motion in the same manner and to the same effect as though complaint had been made,' and the section concludes: 'No complaint shall at any time be dismissed because of the absence of direct damage to the complainant.' In face of this mandatory requirement that the complaint shall not be dismissed because of the want of direct damage to the complainant, no alternative is left the Commission but to investigate the complaint, if it presents matter within the purview of the act and the powers granted to the Commission."

See, also, Interstate Commerce Commission v. Detroit, G. H. & M. Ry. Co. (C. C.) 57 F. 1005, 1008, 1009; Id. (C. C. A.) 74 F. 803, 807; U. S. v. New York Central R. R., 272 U. S. 457, 47 S. Ct. 130, 71 L. Ed. ——; U. S. v. Sumpter Valley Ry. Co., 53 I. C. C. 607; U. S. v. Union Pacific Ry. Co., 28 I. C. C. 518.

We think the broad language employed in section 13 fully authorizes the complainant as a minority stockholder to file a complaint with the Interstate Commerce Commission charging an unjust, unreasonable, and inequitable division of joint rates between the Minnesota Company and the other carriers involved, and that such a complaint so filed would properly invoke the jurisdiction of the Commission, and that upon such a complaint it would proceed to investigate the complaint and report in writing its conclusions, together with its decision, order or requirement in the premises.

## II. Divisions of Intrastate Rates.

[13, 14] It is well settled that the powers of a state Commission are special and limited, and they can exercise only such authority as is legally conferred by express provisions of law, or such as is by fair implication and intendment incident to and included in the authority expressly conferred for the purpose of carrying out and accomplishing the objects for which the Commission was created, and that any reasonable doubt of the existence of any particular power in the Commis-

sion should be resolved against the exercise of such power. State ex rel. Railroad Com'rs v. Louisville & N. R. Co., 57 Fla. 526, 49 So. 39; Siler v. Louisville & Nashville R. R. Co., 213 U. S. 175, 194, 29 S. Ct. 451, 53 L. Ed. 753; Board of R. Commissioners of Oregon v. Oregon Ry. & Nav. Co., 17 Or. 65, 19 P. 702; 10 C. J. p. 54, § 41. We have seen that the fixing of divisions for the future is a legislative function. Terminal R. R. Ass'n v. U. S., supra; Great Northern Ry. v. Merchants' Elevator Co., supra. This legislative power to fix divisions may be lawfully delegated to a state Commission. Grand Trunk Ry. Co. v. Michigan R. R. Commission, 231 U. S. 457, 34 S. Ct. 152, 58 L. Ed. 310; Louisville & Nashville R. R. Co. v. Garrett, 231 U. S. 298, 34 S. Ct. 48, 58 L. Ed. 229; Railroad Commission Cases, 116 U. S. 307, 6 S. Ct. 334, 388, 1191, 29 L. Ed. 636; Minneapolis & St. Louis R. R. Co. v. Minnesota, 186 U. S. 257, 22 S. Ct. 900, 46 L. Ed. 1151, 10 C. J. p. 54, § 39.

In Railroad Co. v. Minnesota, supra, the court said:

"The argument for the railroad companies in this case assumes that, while the state may interfere as between the railways and their customers, the shippers of freight, it cannot do so as between the railways themselves, by fixing joint tariffs and apportioning such tariffs among the several railways interested in the transportation. * * * Granting that a state has no right to interfere with the internal economy of a railroad farther than to secure the safety and comfort of passengers, as, for example, to fix the wages of employés or control its contracts for construction, or the purchase of supplies, it has a clear right to pass upon the reasonableness of contracts in which the public is interested, whether such contracts be made directly with the patrons of the road, or for a joint action in the transportation of persons or property in which the public is indirectly concerned."

[15] We must therefore look to the statutes of Minnesota to determine whether the Legislature authorized the Railroad and Warehouse Commission of Minnesota to fix divisions of joint intrastate rates.

The applicable provisions of the Minnesota statutes are found in sections 4638, 4639, 4640, 4641, 4644, and 4700, General Statutes Minn. 1923. These sections are set out in marginal note 1.

It is clear that by section 4700 the Legislature intended to grant comprehensive powers to the Commission to fix and establish joint rates. But, neither this section nor, so far as we have been able to discover, any other section of the present statutes defining and fixing the powers of the Commission, expressly authorizes it to fix divisions. However, without the power to fix divisions the power to establish joint rates would be incomplete

---

1 "4638. *Proceedings before Commission—How Commenced*—Proceedings before the commission against any such carrier or public warehouseman shall be instituted by complaint, verified as a pleading in a civil action, stating in ordinary language the facts constituting the alleged omission of offense. The parties to such proceeding shall be termed, respectively, 'complainant' and 'respondent.'

"4639. *Notice to Respondent*—Upon filing such complaint, if there appear reasonable grounds for investigating such matter, the commission shall issue an order directed to such carrier or warehouseman, requiring him to grant the relief demanded, or show cause by answer within twenty days from the service of such notice why such relief should not be granted. Such order, together with a copy of the complaint, shall forthwith be served upon the respondent.

"4640. *Answer*—The respondent may file and serve by mail upon the complainant, within twenty days after service of the order, an answer alleging that it has already granted the relief demanded, or setting up any matter of defense. If the answer allege the granting of the relief, the complainant shall within twenty days reply, admitting or denying such allegation. If he fails to reply, or admits the allegation, the proceeding shall be dismissed.

"4641. *Hearings before Railroad and Warehouse Commission*—If the matter be not adjusted to the satisfaction of the commission, it shall set a time and place of hearing, and give at least ten days' notice thereof to each party. The parties may appear either in person or by attorney. The commission shall hear evidence and otherwise investigate the matter, and shall make findings of fact upon all matters involved, and such order or recommendation in the premises as may be just. A copy of such findings and order or recommendation shall forthwith be served upon each party. No proceeding shall be dismissed on account of want of pecuniary interest in the complainant. * * *"

"4644. *Complaint that Rate is Unreasonable—Duty of Commission*—Upon the verified complaint of any person or of any corporation, private or municipal, that any tariff of rates, fares or charges, or any part thereof, or of any classification is unequal or unreasonable, the commission shall proceed to investigate the matters alleged in such complaint. * * *"

"4700. *Powers and Duties of Commission—Notice and Hearing—Schedule of Rates—Revising Rates*—The board of railroad and warehouse commission shall, within ten days after this act takes effect, notify in writing every railway company owning or operating a railway within this state that it will, upon a day named in such notice, which day shall not be more than thirty days after giving said notice, take up for investigation the subject of establishing joint through rates, as herein provided, between the railway lines in this state. It shall also give a similar notice, directed 'To whom it may concern,' and so publish the same that it will have

and ineffectual. The carriers by refusing to agree as to divisions could greatly delay if not defeat the effect of an order fixing a joint rate. The fixing of each carrier's share is really a part of the establishing of a joint rate. Until the division is fixed the rate for practical purposes is incomplete. We think, therefore, that section 4700 by necessary implication conferred power upon the Commission, not only to fix and establish joint rates but also to fix the divisions of such rates between the carriers. That such was the intent of the Legislature is evidenced by the provision "the share of any railroad company of any joint through rate shall not be construed to fix the charge that it may make for transportation for a similar distance over any part of its line for any single rate shipment." This language seems to assume that the Commission will fix divisions.

[16] It will be observed that section 4700 provides that the Commission upon the application of any person interested may revise, change, or add to, any joint through rates fixed or promulgated pursuant to such section. We think that under this provision the complainant could have lodged its complaint and upon a proper showing secured a revision of the joint intrastate rates and the divisions thereof between the Minnesota Company and the Northern Pacific.

[17] The reasons which require preliminary resort to the Interstate Commerce Commission and a determination by it of what is a proper division of a joint interstate rate before judicial relief can be had on account of unjust, unreasonable and inequitable divisions in the past apply with equal force where the question of divisions of intrastate rates are involved, and it logically follows that before the complainant could secure judicial relief on account of past intrastate divisions, it was necessary for it to first apply to the Railroad and Warehouse Commission of the state of Minnesota, and have the preliminary question of what is a fair division of the rates involved first determined by that Commission.

We therefore conclude that the District Court was without jurisdiction to fix divisions of joint rates between the Minnesota Company and the other carriers involved for the future, and because the preliminary question of what is a just, reasonable, and equitable division of joint interstate rates had not been determined by the Interstate Commerce Commission, and of joint intrastate rates had not been determined by the Minnesota Railroad and Warehouse Commission, it was also without jurisdiction to award damages on account of divisions of such joint rates in the past.

The decree appealed from is affirmed, with costs.

---

general circulation throughout the state. All corporations, partnerships and persons interested in the subject may present themselves at the hearing and be heard, under such rules and regulations as the board may prescribe. At the end of the investigation, which shall be carried on with all due diligence, the said board of railroad and warehouse commission shall make and publish a schedule of joint through railway rates for such traffic and on such routes as in its judgment the fair and reasonable conduct of business requires shall be done by carriage over two or more lines of railway, and will promote the interests of the people of this state. In the making thereof, and in changing, revising or adding to the same, the board shall be governed as nearly as may be by the preceding sections of this chapter, and shall take into consideration, among other things, the rates established for shipments within this state for like distances over single lines, the rates charged by the railway companies operating such connecting lines for joint interstate shipments, and the increased cost, if any, of a joint through shipment as compared with a shipment over a single line for like distances. In establishing such rates for shipments in less than carload lots, in cases where at the connecting point or points in the line of shipments the connecting railways have not and are not required to have a common station or stopping place for loading or unloading freight, the board shall make such lawful regulations as in its judgment will be fair and just respecting the transportation of such freight from the usual unloading place of one railway to the usual loading place of the other. The joint through rates thus established shall be promulgated by mailing a printed copy thereof to each railway company affected thereby and shall go into effect within ten days after they are so promulgated; and from and after that time an official printed schedule thereof shall be prima facie evidence, in all courts of this state, that the rates therein fixed are just and reasonable for the joint transportation of such freight between the points and over the lines described therein. The said board shall deliver a printed copy of said schedule to any person making application therefor. The share of any railway company of any joint through rate shall not be construed to fix the charge that it may make for transportation for a similar distance over any part of its line for any single rate shipment or the share of any other joint rate. The board, upon such reasonable notice as it may prescribe, may, upon its own motion or upon the application of any person, firm or corporation interested therein, revise, change or add to any joint through rates fixed or promulgated hereunder; and any such revised, changed or added joint rates shall have the same force and effect as the rate or rates originally established. * * *"